Filed 7/7/21  Guerrero v. Crown Energy Services CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| MARIA GUERRERO,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CROWN ENERGY SERVICES, INC.,<br><br>Defendant and Appellant;<br><br>JONES LANG LASALLE AMERICAS, INC.,<br><br>Defendant and Respondent. | D076299<br><br><br>(Super. Ct. No. 37-2017-00020532-CU-WT-CTL) |
| MARIA GUERRERO,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CROWN ENERGY SERVICES, INC. et al.,<br><br>Defendant and Appellant. | D077201<br><br><br>(Super. Ct. No. 37-2017-00020532-CU-OE-CTL) |

APPEALS from a judgment of the Superior Court of San Diego County, Kenneth J. Medel, Judge.  Affirmed in part, reversed in part and remanded with instructions.

Ogletree, Deakins, Nash, Smoak & Stewart, Charles L. Thompson, Cara F. Barrick, Jennifer M. Hendricks and Jack Sholkoff for Defendant and Appellant.

Gruenberg Law, Joshua D. Gruenberg, Joshua P. Pang, Pamela Vallero; Williams Iagmin and Jon R. Williams for Plaintiff and Appellant.


INTRODUCTION

Maria Guerrero worked as a janitor for Crown Energy Services, Inc. dba Able Engineering Services (Able Engineering) at a 23-story commercial high-rise building.  After 10 and one-half years without disciplinary action, Guerrero was written up four times and twice suspended in the last six months of her employment for alleged violations of company policy, then ultimately discharged.  Each discipline event happened shortly after she used accrued sick time for medical reasons, including to attend doctors' appointments to address a shoulder injury she had suffered on the job years earlier.

Guerrero sued Able Engineering under the Fair Employment and Housing Act (FEHA), Government Code section 12900 et seq.,[1] asserting Able Engineering had illegally discriminated against her on the basis of a

_____

[1]     All unspecified statutory references are to the Government Code unless otherwise indicated.

2

physical disability.[2]  The jury agreed, found Able Engineering liable, and awarded her $207,855.60 in compensatory damages and $900,000 in punitive damages.

Before the case was given to the jury, Able Engineering unsuccessfully moved for nonsuit.  After the jury returned its verdict, Able Engineering moved for judgment notwithstanding the verdict (JNOV), but that motion was also denied.  The trial court entered judgment for Guerrero.

On appeal, Able Engineering challenges the denial of its nonsuit motion, arguing the evidence failed to establish any of the elements of a physical disability claim.  Able Engineering also seeks reversal of the punitive damages award on the basis that Guerrero's supervisor was not a "managing agent" whose conduct could result in corporate liability for punitive damages under Civil Code section 3294, subdivision (b).  We reject these claims and affirm the judgment on the merits.

In a cross-appeal,[3] Guerrero contends the trial court erred in declining to apply a multiplier in its post-judgment award of attorney fees to her, as the prevailing party under FEHA pursuant to section 12965, subdivision (b).  We agree with Guerrero that the trial court applied the wrong legal standard in declining to apply a multiplier based on its mistaken belief that a multiplier is inappropriate in a single-plaintiff FEHA case such as this.  Accordingly, we reverse the trial court's attorney fees order and remand with directions to consider application of a multiplier under the correct legal standard.  We express no view on the outcome of the court's decision.

---

[2]    Guerrero also sued Jones Lange Lasalle Americas, Inc. (JLL), the building's property manager, but the jury found JLL not liable and the trial court entered judgment in favor of JLL.

[3]    We have consolidated these appeals on Guerrero's unopposed motion.

3

# FACTUAL AND PROCEDURAL BACKGROUND

## I.

## *Evidence at Trial*[4]

### A.  *Background*

Able Engineering provided stationary engineering services to commercial high-rises and other buildings, including preventative maintenance and repair of a building's mechanical infrastructure.  It primarily employed operations engineers and professionals who repaired and maintained HVAC, plumbing, electrical, and building automation systems. One of Able Engineering's buildings was a 23-story commercial hi-rise at 655 West Broadway in downtown San Diego, known as the First Allied Plaza (the Plaza).

For 11 years since August 2005, Guerrero worked for Able Engineering as a "day porter" or daytime janitor at the Plaza.  She was one of the two janitors who cleaned the building and worked the 6:00 a.m. to 3:00 p.m. shift, while her co-worker, Juan Valdez, worked the 8:00 a.m. to 5:00 p.m. shift. Guerrero's duties included cleaning the lobby walls, security counter, and elevators.  Each day, she cleaned 90 toilets, 36 sinks and 18 mirrors, and changed the paper rolls and paper towels in the building's restrooms.  She cleaned the kitchens on certain floors twice a day.  She also cleaned the

---

4    Consistent with the applicable standards of review, our summary of the facts reflects the evidence presented at trial when considered in the light most favorable to Guerrero.  (*M&F Fishing, Inc. v. Sea-Pac Ins. Managers, Inc.* (2012) 202 Cal.App.4th 1509, 1532 (*M&F Fishing*) [nonsuit motion]; (*Brennan v. Townsend & O'Leary Enterprises, Inc.* (2011) 199 Cal.App.4th 1336, 1345 (*Brennan*) [motion for JNOV].)

parking lot elevators. Three times a week, she was required to clean the lobby floor using a heavy machine.

At the beginning of Guerrero's employment, her direct supervisor was Dan Pollino, a chief engineer.[5] Pollino reported to Steve Wong, whose title was described as either regional manager or an account manager.

Able Engineering did not typically employ janitorial staff, but another company, Able Building Maintenance (Able Building),[6] primarily employed janitors. Guerrero and Valdez were placed on Able Engineering's payroll as a favor to the Plaza's property manager because Able Building did not otherwise have a presence at the building. However, Able Building managers, Gregg Budgell and Nataly Arellano, would provide a substitute janitor to work at the Plaza when either Guerrero or Valdez needed to take time off.

Wong testified that in October 2010, he transitioned Guerrero from Able Engineering to Able Building because it was a janitorial company, while

---

[5] The reporter's transcript in this case has some obvious typographical errors. Instead of "Cinco de Mayo," for example, in some places it states "sing owe deny oh"; in the relevant part of the transcript describing supervision at the building, instead of "chief engineer," the transcript records the witness's words as "cheer engineer." We infer the true meaning from context.

[6] The precise relationship between Able Engineering and Able Building was not established during the liability phase of the trial. Wong testified that Able Engineering and Able Building were separate entities. However, emails admitted into evidence at trial showed that email addresses of employees of both companies used the same domain name of @ableserve.com. Both entities were headquartered in San Francisco and both of their regional offices were housed in the same building in Los Angeles. A regional manager from Able Building referred to both companies collectively as the "Able family." Managers from both companies used the same office space in Kearny Mesa.

Able Engineering was "an engineering company." Wong told Guerrero she was being "transitioned over" or "switched over from one Able company to the other Able company." To accomplish the transfer, Wong completed an "Able Services" "Termination of Employment" form and stated "Company change" as the reason for the action. In January 2011, Wong moved Guerrero back to Able Engineering at the property manager's request after Guerrero discovered her medical benefits had been negatively affected by the transfer to Able Building and complained.

In February 2015, the Plaza was purchased by a new owner who brought in a new property management company, JLL. JLL employed its own operations engineers, making Able Engineering's operations engineering staff unnecessary. It was around this time that Pollino stopped working for Able Engineering and Wong became Guerrero's direct supervisor.

B.     *Guerrero is Injured at Work in 2010*

Guerrero was in good physical health when she started working at the Plaza. But in early 2010, she injured her shoulder at work while wringing a mop. The mop broke and her hand slipped. She heard "a pop" and "felt something hot . . . running" down her arm. Guerrero reported the incident to Pollino, who was standing nearby, and his response was, "okay, I will buy you another [mop]."

After she injured herself, Guerrero developed pain in her right shoulder. On February 3, 2010, she saw Dr. Emily Churchill, a board-certified internal medicine specialist. Dr. Churchill's progress note for the visit indicated that Guerrero had been suffering from intermittent arm pain for three weeks, and that the pain was worse with neck and arm movement.

Guerrero saw Dr. Churchill again on September 16, 2010. She reported to Dr. Churchill that she had neck and shoulder pain that had been "worse

6

for the last two to three months." Upon examination, Dr. Churchill noted abnormalities in Guerrero's neck and shoulder and observed she had a limited range of motion in her shoulder. In particular, Guerrero was unable to perform a range-of-motion test that required her to internally rotate her arm in a maneuver similar to scratching her back. Dr. Churchill found that Guerrero had adhesive capsulitis, or scar tissue, secondary to shoulder pain. Dr. Churchill's opinion at the time of this visit was that Guerrero had suffered a shoulder injury. She ordered an X-ray and referred Guerrero to physical therapy.

On February 23, 2014, Guerrero went to the emergency room for exacerbation of chronic neck pain. On March 6, she was seen by Dr. Churchill with complaints of persistent pain and neck tightness. Guerrero's pain from her shoulder injury persisted and limited her ability to engage in certain activities. She would "lose control of [her] arm" and "[i]f [she] carried something, . . . it would just suddenly happen, [she] would drop things." She could not raise her injured arm as high as her uninjured arm because it felt like it was "detaching, like someone was pulling it." Because of her injury, she was unable to carry her grandchildren or "enjoy them when they were born" because she was afraid she "would drop the baby[.]"

Guerrero's daughter, Tania Hoeckelmann, knew her mother had injured her shoulder and observed Guerrero "cradling or protecting her arm[.]" Over time, Hoeckelmann noticed that Guerrero's "complete range of motion had stopped." Hoeckelmann "would never see her [mother] reach over to grab [something.]" "Even reaching for a cup in the cabinet was too high for her." Guerrero started to keep things lower to "make it easier" and "accessible" for herself. It was visible "how she stopped doing a lot of things because of . . . the loss of mobility and strength in her hand."

The injury "affected" Guerrero and "limit[ed] [her] in a lot of things" at work. She started to "use [her] left arm, so [she] wouldn't keep hurting [her] right arm." Her shoulder pain made it "very difficult" to operate the heavy machine used to clean the lobby floors. When she tried to turn the machine to the left or right, it was "much more painful for [her] arm." When she told Pollino she could not use the machine because of her pain, he responded, "if they are telling you upstairs that you have to use it, then you have to use it." Guerrero then changed the way she used the machine so she was "mostly working [her] left arm[.]"

Because of her shoulder injury, Guerrero could not raise her arm to its fullest extent, "carry[ ] heavy things" or lift heavy boxes. Guerrero conveyed these concerns to Wong, Budgell and Arellano, and when she did so, they would send someone to help her with the boxes. It was also difficult for her to lift her arm to "dust the walls" because "those walls were really high," so she had to use "an extension" for this task. She "would always tell" someone at Able Engineering when she "had doctor's appointments for [her] shoulder problem."

Over time, Hoeckelmann grew concerned because her mother's shoulder condition got progressively worse. Guerrero was experiencing not just soreness, but "pain" as if she was "losing motion." Hoeckelmann accompanied Guerrero to an appointment with Dr. Churchill on May 5, 2016. One of Guerrero's chief complaints was right shoulder pain. Dr. Churchill examined Guerrero and found she had diffuse tenderness in her AC joint, which is on top of the shoulder; could only raise her arm to 70 degrees, which was less than normal; and was unable to internally rotate her shoulder to scratch her back. Dr. Churchill had Guerrero perform a "drop test," in which she was "supposed to be able to resist" the doctor pushing down on her fully

8

extended arm, to determine if there was a rotator cuff rupture or tear. Guerrero was unable to perform the test. Dr. Churchill diagnosed Guerrero with "severe rotator cuff tendonitis" and confirmed her findings were "[a]bsolutely" consistent with a shoulder injury and severe shoulder pain.

Dr. Churchill explained the diagnosis of a rotator cuff condition is "often" related to neck pain (i.e., the pain for which Guerrero sought treatment at the emergency room in 2014), and that her failure to identify it earlier may have been because "it went under-diagnosed." Dr. Churchill referred Guerrero to "orthopedics for further evaluation and possible treatment" and wrote up the referral as "stat." to expedite the appointment. She also indicated Guerrero "may require [an] MRI" given the "severity of pain and duration of symptoms."

Guerrero saw the orthopedist by May 23, 2016, who referred her to a neurologist. Guerrero saw the neurologist on June 2 and after conducting nerve tests, the neurologist ordered an MRI. But Guerrero was unable to have the MRI done, because by that point, she had lost her job.

C.    *Guerrero Is Repeatedly Disciplined and Then Discharged by Wong*

By all accounts, Guerrero's superiors considered her to be a hardworking and valued employee. In late 2010, she was lauded by Jeffrey Niles, the district manager of Able Building, for preparing food for the Plaza's tenants. After visiting the Plaza, Niles sent an email to the Plaza's owner and the upper management team of Able Building and Able Engineering, including Wong, and said it was his "esteemed privilege" to enjoy food Guerrero had made at home, brought to work and served to building staff and tenants. Niles said he "watched about [three] dozen people" enjoy Guerrero's "authentic [M]exican food made from scratch" and he was "proud to have [Guerrero] representing our company as a whole[.]" The Plaza's owner

9

responded that "this [is] a great example of the 'culture' I believe our team is always trying to create and foster . . . !"

For the first 10 and one-half years of her tenure at the Plaza, from 2005 until 2015, Guerrero had received no negative employee reviews or written disciplinary actions. Starting in December 2015, however, she was written up by Wong four times and twice suspended in six months and then ultimately discharged in June 2016. Each disciplinary measure happened shortly after Guerrero used accrued sick time for medical reasons, including for doctors' visits to address her shoulder injury and pain.

The disciplinary measures also appeared to have coincided with JLL taking over management of the Plaza and specifically with Julie Krouse, JLL's senior general manager, onboarding in December 2015. Before JLL managed the Plaza, Wong and Pollino had allowed Able Engineering's janitors to take sick days or vacation days without submitting anything in writing. Krouse, however, instructed Wong that she wanted the janitors' use of sick time and vacation time to be documented. JLL was billed by Able Engineering when its janitors took sick days or vacation days, and Krouse wanted the supporting documentation to ensure their time was tracked accurately.

1. *First Disciplinary Action—December 21, 2015*

On December 8, 2015, Guerrero submitted a written request to use some of her accrued personal time off (PTO), including some "Floating Days," one vacation day, and one sick day for a doctor's appointment on January 7, 2016. Wong granted the request.

Shortly after, on December 21, Guerrero received her first disciplinary action. In an "Employee Warning Slip" form, Wong wrote up Guerrero for

violating company rules by "soliciting during work time" on December 18, and for "changing shift without authorization" under a category of "Other."

Regarding the solicitation offense, Wong wrote on the warning slip that "[Guerrero] was seen on site catering a breakfast for a tenant in the building . . . by building staff." According to Wong, JLL's chief engineer saw Guerrero on December 18 taking burritos to a tenant. He complained to Krouse, who complained to Wong. Guerrero explained at trial she had prepared the burritos at home at the request of the tenant, who had given Guerrero money to pay for the ingredients. Guerrero had swapped shifts with her co-worker Valdez that day so she could deliver the burritos to the tenant before starting work.

Wong testified it would have been acceptable to Able Engineering if Guerrero were to prepare food for a potluck and receive donations in exchange for doing so, but making food at a tenant's request and receiving money for the cost of the ingredients transformed the activity into "catering," a form of "solicitation." Wong further testified that when he disciplined Guerrero, she told him "she was used to bringing food to the building" and she "didn't realize that taking money . . . was a violation." Wong let her know that "things changed, over the years" and that food poisoning and insurance had become concerns. Wong also testified Krouse had expressed concerns about JLL becoming liable if someone were to become sick from eating the food. Yet earlier that same December, Guerrero had made and delivered holiday tamales to JLL's office at the request of one of JLL's employees, for which she received Krouse's personal thanks. At trial, Krouse acknowledged that Guerrero had brought tamales to the office for her and other JLL employees.

11

As for the unauthorized change-of-shift offense, Wong acknowledged at trial that Guerrero told him she and Valdez had been switching shifts for years without consequence.

Wong testified he had discretion to decide what level of discipline to impose, including whether to give verbal counseling, written discipline, or suspension, and he decided to give Guerrero a written warning in this instance because she had violated the company's policy against solicitation. After Wong issued Guerrero the warning slip, he brought her to Krouse's office. He explained he did this because he was a "buffer for . . . the property management and our employees, that's why they contract it out" and he wanted to let Krouse know "it was taken care of."

2. *Second Disciplinary Action—February 18, 2016*

On February 9, 2016, Hoeckelmann emailed Wong to inform him that her mother had just learned her doctor's office had changed an upcoming medical appointment unexpectedly, and that Guerrero would need to leave work by noon on February 11 to attend the appointment. Wong granted the request.

Nine days later, on February 18, Guerrero received her second disciplinary action. In the employee warning slip, Wong wrote that Guerrero's misconduct was sharing "confidential information," that is her "bonus information." Wong testified Krouse told him that JLL engineers had complained to JLL management that Guerrero and her coworker had received bonuses. Wong wrote on the warning slip that Guerrero and her coworker denied sharing their bonus information, and "somehow the engineering department got hold of this information and brought it to management's attention." Wong did not talk to the JLL engineers and admitted at trial that he simply accepted Krouse's version of the events.

12

The warning slip also had boxes for Wong to indicate whether the offense was a "Violation of Company Rules" or "Fail[ure] to Follow Orders," but Wong did not check these boxes. The only box he checked was "Other." Guerrero testified that when she received her bonus two months earlier, she understood it to be a reward for her 10 years of service at the Plaza, and neither Wong nor JLL had informed her that it was "a secret."

3.   *Third Disciplinary Action—May 23, 2016 Suspension*

On April 19, 2016, Hoeckelmann emailed Wong and attached her mother's written request to take PTO in May. Guerrero requested 12 days off starting on May 5, and she wrote: "I am requesting Thursday 5/5 as sick, as I have several Dr. Appts and Lab work." She was also asking to use vacation days from "Friday 5/6 Returning Monday 5/23."

Guerrero testified she needed the time off for different medical appointments. The first appointment was on May 5 with Dr. Churchill, which, as we discussed *ante,* is when Dr. Churchill diagnosed her with "severe rotator cuff tendonitis." She also had an appointment with a dermatologist who was going to put allergy patches on her skin that had to remain in place for two weeks. She had been instructed not to shower for that two-week period and did not want to go to work without showering.

Wong granted the PTO request and Guerrero took her PTO. When Guerrero returned to work on May 23, 2016, the security guard at the Plaza told her she was not allowed to work that day and "that it was an order from Julie [Krouse], the property manager." Guerrero called Wong, and he told her to meet him at the company's office in Kearny Mesa. Guerrero called Hoeckelmann and asked if she would accompany her to the meeting. When they met Wong at the office, Guerrero received a written warning and a three-day suspension without pay. At trial, Guerrero's and Hoeckelmann's

13

account of Wong's explanation for the suspension differed somewhat from Wong's account.

      a.    *Guerrero's and Hoeckelmann's Testimony About the Stated Reason for Guerrero's Suspension*

Guerrero and Hoeckelmann both testified that Wong told them Guerrero was being written up and suspended without pay "for changing . . . the schedule of duties." Hoeckelmann testified: "[B]efore my mom took time off, they had asked what her schedule of duties was for the building, so my mom wrote out a schedule, of her duties of what she does, day-to-day. . . . [T]hey had told her that she went back and handwrote another schedule of duties, that contradicted this, and had supposedly told whoever was covering to ignore the original one and cover this one." According to Hoeckelmann, Wong told her and Guerrero that "there was . . . a list of duties that was provided, and [Guerrero] had written a separate list of duties," and the lists were conflicting.

Guerrero testified Maria Salazar, a janitor hired by Able Engineering in April 2016 to replace Valdez, was to fill in for Guerrero while she was out from May 5 to May 23. Salazar asked Guerrero to write out a list of the tasks she performed each day because Salazar "want[ed] to do the work exactly the same way that [Guerrero] do[es] it." Guerrero wrote the list in her own handwriting, telling Salazar, "I do this at this time, and I do this at that time," and gave it to Salazar. Guerrero was "shocked" at the accusation of wrongdoing. She spoke to Hoeckelmann in Spanish so Hoeckelmann could translate and tell Wong "exactly what happened." With Hoeckelmann translating, Guerrero told Wong that Salazar had asked her how she performed her duties each day and "in what order," so Guerrero "wrote that out for her, but [she] didn't change anything."

14

Hoeckelmann "kept asking" Wong if she could see the "conflicting lists" because she "want[ed] to see where the conflicts are, so [her] mom knows what happened[.]" Wong told Hoeckelmann, "well, I don't have it." He then told her, "we have already . . . decided that this is the action we are taking" and "we will just say it was [a] lack of communication problem." But "it didn't sound like a communication problem" to Hoeckelmann because Wong "specifically said it was because of these conflicting lists."

As Wong finished writing up the warning slip, Hoeckelmann told Wong that Guerrero had an "upcoming doctor's appointment" scheduled for June 2 and asked him how he wanted Guerrero to request that time off. Wong told Hoeckelmann to fill out a PTO request. He then said to Hoeckelmann, "I noticed your mom's been taking a lot of sick time for doctor's appointments" and asked her, "is everything okay?" or "what's going on[?]" Hoeckelmann told Wong, "not that she needs to tell you why she's going to the doctors, but she's going because she still has pain in her arm from when she hurt it." Wong "quickly went well, . . . you can't say it was from work, then he look[ed] at [her] mom, and he goes, at our age, everything hurts." Hoeckelmann told Wong, "no, this is beyond, this is not aches and pain, like, she's hurting."

b.    *Wong's Testimony About His Reasons for Suspending Guerrero*

According to the warning slip Wong issued to Guerrero on May 23, 2016, Guerrero was being disciplined for "communication . . . issues" observed on May 4. He wrote that "[Guerrero] has been asked to communicate and report issues to Nataly [Arrellano] & Gregg [Budgell] [and] she still continues to operate on her own without properly communicating issues to Able so that the issues or problems can be managed by proper parties." He further wrote that "[a] meeting was held to coach [and] mentor [Guerrero] through the process and changes. Amoung [*sic*] other issues that has arisen in the pas[t]

15

with [Guerrero's] performance this is her second warning. A [three] day suspension is a result of this write up. Any further issues will result in further action leading up to discharge."

Wong testified he disciplined Guerrero on May 23 because Budgell and Arellano had brought to his attention that Guerrero "was having problems . . . again communicating" with them regarding "things that are going on." He explained, "we were trying to find out information about her duties" and "she was not being communicative with [Budgell]."

Although Budgell and Arellano were Able Building managers, Wong testified he had told Guerrero she should communicate with them "about operational issues" in anticipation of a company transition. He explained that in January 2016, JLL had awarded Able Building the contract to provide nighttime janitorial services at the Plaza. It was then decided that "it made sense for [Able Engineering] to give [Able Building] the daytime day porters[.]" In anticipation of the transition, Wong told Guerrero and Valdez "they would be put[ ] over on to the . . . side . . . where . . . [Budgell and Arellano] would be their supervisors." Wong testified Budgell and Arellano became Guerrero's "interim supervisors." Then, on May 6, Wong received a letter from JLL officially terminating Able Engineering's day porter service contract as of June 3.

Wong's testimony on when he instructed Guerrero to communicate with Budgell and Arellano "about operational issues" varied, with Wong repeatedly stating he did not remember. He initially testified it was in approximately "mid year of 2016" or "May or June of 2016," then "it could have been" in January 2016, and ultimately agreed he could have told Guerrero to communicate with Budgell and Arellano "any time between January 2016 to May 4, 2016." However, Wong did not tell Guerrero the

16

reason for his instruction. He explained that even if he knew a transition or loss of contract was imminent, he "[g]enerally" did not let the employees know "because a lot of times during transition periods, there is a lot of angst, a lot of questions, a lot of feelings that go on, about their jobs, so until the transition actually happens, then, you know, we finalize it."

As for Guerrero's alleged offense, Wong provided the following testimony when he was asked to explain the nature of Budgell's and Arrellano's complaint against Guerrero:

"Q. What was Gregg and Nataly's complaint again?

"A. That Maria was having a hard time, um, giving, sending information back and forth to Nataly and Gregg.

"Q. So Gregg and Nataly were complaining that Maria was having problems communicating issues to Gregg and Nataly, correct?

"A. Correct.

"Q. What issues were they?

"A. Operational issues.

"Q. Like what?

"A. Cleaning, scheduling, um, that kind of thing."

Three days before Guerrero was disciplined, on May 20, 2016, Budgell had emailed Wong and told him "he just wanted [Wong] to be sure that we put the highest amount of . . . discipline that we could possibly do to give her, for this issue." Wong claimed he had not punished Guerrero simply because Budgell told him to do so. Rather, his supervisory role afforded him "discretion" as to the type of disciplinary action that was appropriate, and "in [his] discretion" he decided that suspension without pay "was warranted."

Wong acknowledged that toward the end of the May 23, 2016 meeting, he asked Guerrero "how her vacation went and how her doctor's appointment

17

went when she came back." He told Hoeckelmann he had noticed her mother had been taking medical leave and asked what was wrong with her, because he was "concerned." It was at that point that Hoeckelmann told Wong her mother was "going [to the doctors] because she still has pain in her arm from when she hurt it." Wong testified his interest was piqued: "[W]hen . . . one of my employees said they got hurt at work, my red flags go up, so I asked her some details of what happened[.]"

Wong explained that Guerrero told him she was using a mop, "somehow it slipped or something, [and] she strained her shoulder." Guerrero told Wong that Pollino was there at the time and she reported to Pollino that "she broke her mop" and "hurt her shoulder." She told Wong that her doctor thought she might have nerve damage.

Wong admitted making a comment to Guerrero and Hoeckelmann about everyone suffering aches and pains. He explained he was being "sympathetic" because Guerrero "said she had aches and pains and her shoulder hurt and [he] was being sympathetic to her [because he] also [had] the same kind of issue" from "lift[ing] weights."

Wong's testimony about when he first learned about Guerrero's shoulder injury was inconsistent. In deposition testimony played for the jury, Wong testified Guerrero told him twice that she was suffering from shoulder pain, and the first time she told him was in February or March of 2016. In the same deposition, Wong also testified he first learned about Guerrero's shoulder injury during the May 23 meeting, which testimony he maintained at trial. Although company policy in 2010 would have required Pollino to report workplace injuries to upper management, Wong denied that Pollino had ever reported Guerrero's injury to him.

18

Immediately after meeting with Guerrero and Hoeckelmann on May 23, 2016, Wong contacted his supervisor, the company's vice president, and together they called Robb Bury, a company safety director. At 11:22 a.m. on May 23, Bury sent the following email to Brian DelBono, safety supervisor, with the subject line "Maria P Guerrero":

"Brian,

"Just got off the phone with [. . .] Steve . . . evidently Maria Guerrero, janitor, has an ongoing personal medical condition with her shoulder.

"She has now stated that her GP is thinking she could have nerve damage, and that this could be work related.

"Coincidently, she has just undergone disciplinary action."

4.      *Fourth Disciplinary Action and Discharge—June 6, 2016*

As Hoeckelmann told Wong at the May 23, 2016 disciplinary meeting, Guerrero had a scheduled doctor's appointment on June 2. On May 25, Hoeckelmann emailed Wong a PTO request on behalf of her mother for one sick day on June 2 for the doctor's appointment. Wong approved the request.

When Guerrero returned to work on June 6, 2016, the security guard at the Plaza again told her "she had orders that [Guerrero] couldn't come in[to] [the building] anymore" and she was turned away. She called Wong, and he told her to meet him at the Kearny Mesa office. Guerrero called Hoeckelmann, who met her at the office.

When Guerrero and Hoeckelmann arrived, Wong told Hoeckelmann "there might be a chance [she] can't sit in this meeting" and he needed to "check." Wong then brought the women into a conference room where

Budgell and Arellano were present.[7]  Wong started the meeting by saying "we are gonna have to suspend your mom for three days without pay." Hoeckelmann and Guerrero immediately responded that Guerrero "literally just got back to work, what happened[?]"  Wong told them:  "[S]omeone has accused your mom of something, and we need to investigate, so she needs to be suspended until we investigate."

When Hoeckelmann asked Wong what her mother had been accused of—so she could "have a chance to tell . . . her side of the story"—Wong said, "I can't tell you."  He would only say "there was a conflict with . . . someone at work."  Budgell interjected and told Hoeckelmann:  "[N]ot that you would understand, [because] this is involving multi million dollar contracts, but we will do whatever it takes to keep our client happy."  At this point, Budgell and Arellano left the room.

At the meeting, Wong issued Guerrero an employee warning slip that only stated, "Maria has been accused of conflict with another employee at the work site" and she "has been place[d] on suspension pending investigation." On the form, Wong left blank the space for the date and time the offense was purportedly observed.  The name of the employee with whom Guerrero allegedly had conflict was never disclosed to Guerrero, either at the meeting or on the form.  Guerrero testified she was unaware of having conflicts with anyone at the Plaza.

At some point, Wong told Guerrero and Hoeckelmann that he was "not gonna be in charge of this building any longer" and that Budgell and

_____

7      The evidence about what transpired during this meeting conflicted. Consistent with the applicable standard of review, we recount the events as established by the evidence when viewed in the light most favorable to Guerrero.  (See fn. 3, *ante*.)

Arrellano would be taking over. He explained Guerrero "would have to reapply" for employment with Able Building when the transition took place. Hoeckelmann then asked why it could not be "an inter-company transfer as they have done . . . before[.]" Wong responded that Guerrero needed to apply to "see if they could find her work" but said it would not be worth it for her to do so because she would not "get it."

Wong's subsequent investigation of Guerrero's alleged misconduct consisted of reviewing written statements from two employees, Salazar (who covered for Guerrero during her requested time off) and Eliacim Perez, dated June 6, 2016.

Salazar wrote in her statement that Guerrero had "treated [her] different[ly] and [she] felt uncomfortable" since she started working at the Plaza on April 25, 2016. Salazar "was very upset with [Guerrero] because [Guerrero] was never pleased with the cleaning . . . [Guerrero] always made mean comments and always wanted [her] to clean her ways [*sic*]." Salazar claimed Guerrero was "unprofessional" and "cruel" to her but she did not notify her supervisor of these issues because she "was hoping things [would] change but the issues got worse." Salazar stated she notified her supervisor that she would resign if Guerrero continued working at the Plaza.

Perez wrote Guerrero made her "feel uncomfortable" with "inappropriate comments" that she made on May 2 to May 4, such as asking Perez, "what are you doing here?" Perez claimed Guerrero "was really demanding and made [her] do extra work that was not on the daily schedule" and "instructed [her] not to touch any supplies without her permission."

Other than reviewing the written statements of Salazar and Perez, Wong did nothing further to investigate Guerrero's alleged misconduct, including taking a statement from Guerrero. The next morning, on June 7,

21

2016, Wong called Hoeckelmann and told her his investigation had been "inconclusive" and "he couldn't find any evidence to support the claim." He said he would reinstate Guerrero's pay for the three-day suspension, but because Able Engineering no longer had the JLL day porter contract, "we are just gonna go ahead and let your mom go" as of the next day, June 8.

Hoeckelmann was upset that Guerrero was never asked for her side of the story and told Wong she wanted to get to the bottom of the issue. Wong testified he "told [Hoeckelmann] that it was best for [him] to just leave it as it is, as inconclusive, . . . because if [he] found her guilty of being the aggressor, it wouldn't be in her favor." He explained at trial that he "felt for [Guerrero]" and so "[i]nstead of . . . doing the investigation to a point where [he] found cause, [he] just decided to find it inconclusive." Wong reiterated that he had discretion over the level of punishment to impose on Guerrero. He decided to reinstate her pay for the three-day suspension because "[he] just felt for her and [he] wanted to reinstate the pay, . . . so she can move on from it."

Guerrero learned from her daughter that Wong's investigation was inconclusive but that he was laying her off "because they no longer had the contract" and "don't have work there anymore." Guerrero testified she "felt like [her] life fell apart, like [her] world was finished" because she was 60 years old at the time and felt it would be "so difficult" for her "to start over at [her] age." She had hoped to retire from the Plaza.

On June 8, Wong completed a "Separation of Employment" form and checked boxes labeled "Layoff" and "Loss of Project Contract" as the reasons for separation. Wong confirmed at trial that Guerrero was not terminated for cause, and the only reason her employment at Able Engineering ended was that she had been laid off due to a "[l]oss of contract."

22

Guerrero did not apply for a job with Able Building "[b]ecause they didn't offer it to [her]." Salazar, who was an employee of Able Engineering at the time she complained about Guerrero, testified that Wong told her the company was going to be "transferring" her. Wong "filled out all the papers [for the transfer] for [Salazar]." When she appeared as a witness at trial, Salazar was still working as a janitor at the Plaza and was an employee of Able Building.

Guerrero later secured work as a janitor with another company, but at a lower hourly rate than she had earned at Able Engineering. In 2018, she underwent shoulder surgery.

## II.

### *Procedural Background*

On June 7, 2017, Guerrero filed an action against Able Engineering[8] and JLL (collectively, Defendants). Her operative first amended complaint asserted a claim for disability discrimination in violation of section 12940, subdivision (a), as well as other employment-related causes of action, and

---

[8] Guerrero's suit named three defendants: "Able Engineering Management Co., LLC," "Ableserve Management Company," and JLL. A joint answer to her operative complaint was filed on behalf of two entities: JLL, and "Crown Energy Services, Inc. dba Able Engineering (erroneously sued as Able Engineering Management Co., LLC and Ableserve Management Company)." Prior to trial, the court entered a minute order stating that "[t]he parties stipulate that defendant Crown Energy Services Inc. and Able Engineering are one and the same." The special verdict form completed by the jury gave the jury the option to answer questions about only two entities: "Able Engineering" or "Jones Lang Lasalle." The judgment entered after trial was entered against Crown Energy Services, Inc. dba Able Engineering, only. Thus, the defendants named in Guerrero's operative pleading appear to have been replaced, through a combination of defense counsel's suggestion and plaintiff's counsel's accession, from the entities she originally named to Able Engineering and JLL.

sought punitive damages as well as statutory attorney fees. Before trial, Guerrero dismissed all causes of action except for the disability discrimination claim.

At trial, Guerrero testified on her own behalf and called as witnesses Wong, Arellano, Salazar, Perez, Hoeckelmann, Krouse, and Dr. Churchill. When Guerrero rested her case-in-chief, Defendants moved for nonsuit. They argued, among other things, that Guerrero had presented "[n]o [e]vidence" that she suffered from a physical disability within the meaning of FEHA; that they knew she had a disability; and that a physical disability had been a substantial motivating factor for her discharge. They further argued there was no evidence that any actor, including Wong, was a managing agent under Civil Code section 3294 whose conduct could support the imposition of punitive damages against them.

The court denied the motion. Defendants then rested their case without presenting evidence, and the matter was submitted to the jury. After a little more than a day of deliberation, on March 1, 2019, the jury returned a special verdict in favor of JLL and against Able Engineering.

The jury determined, among other things, that Guerrero had a physical disability that was known to Able Engineering, and that her disability was a substantial motivating reason for an adverse employment action taken by Able Engineering. The jury also determined that Able Engineering's loss of contract with JLL was a substantial motivating reason for Able Engineering's decision to discharge Guerrero, but that Able Engineering would not have discharged Guerrero "anyway at that time based on the termination of Able Engineering's contract with JLL, had . . . [it] not also been substantially motivated by discrimination."

24

The jury awarded Guerrero $19,494 in past lost wages, $38,361.60 in future lost wages, and a total of $150,000 in past and future noneconomic damages. The jury further found Guerrero had proven by clear and convincing evidence that Able Engineering was guilty of oppression or malice and, at the conclusion of the punitive damages phase of the trial, it awarded her $900,000.00 in punitive damages. On April 24, 2019, the trial court entered judgment in favor of Guerrero and against Able Engineering in the total amount of $1,107,855.60, exclusive of Guerrero's attorneys' fees and costs.

Able Engineering later filed a motion for new trial and motion for JNOV. On June 14, 2019, the trial court entered a minute order summarily denying both motions. On July 17, Able Engineering filed a notice of appeal.

After judgment, Guerrero moved for recovery of attorney fees and costs as the prevailing party under FEHA. On October 28, 2019, the court granted the motion in part and awarded Guerrero $342,284 in attorney fees, less than she had sought, and $30,524.77 in costs. On December 23, 2019, Guerrero filed a notice of appeal challenging this order.

## DISCUSSION

### I.

### *There Was Substantial Evidence of Able Engineering's Liability for Physical Disability Discrimination*

Able Engineering challenges the trial court's denial of its motion for nonsuit, arguing the evidence at trial was not sufficient to satisfy the elements of Guerrero's disability discrimination claim. We disagree and conclude nonsuit was properly denied.

25

A.    *Standard of Review*

The parties disagree over the applicable standard of review.  Able Engineering asserts that it "concedes the truth of Guerrero's testimony" and the "decisive facts are [therefore] undisputed . . . ," leaving only a question of law for this court to review de novo.  Guerrero counters that a trial court's denial of a motion for nonsuit must be reviewed under the substantial evidence standard.  Both parties are correct in certain respects.

"A motion for nonsuit is a procedural device which allows a defendant to challenge the sufficiency of plaintiff's evidence to submit the case to the jury."  (*Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, 117 (*Campbell*).)  "Because a successful nonsuit motion precludes submission of plaintiff's case to the jury, courts grant motions for nonsuit only under very limited circumstances."  (*Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 838 (*Carson*).)  "The rule is that a trial court may not grant a defendant's motion for nonsuit if plaintiff's evidence would support a jury verdict in plaintiff's favor."  (*Campbell*, at pp. 117–118; accord *Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1214.)

An order denying a motion for nonsuit is reviewed de novo, "using the same standard as the trial court."  (*Crouch v. Trinity Christian Center of Santa Ana, Inc.* (2019) 39 Cal.App.5th 995, 1013.)  This means we will affirm the order so long as it is supported by substantial evidence.  (*Ibid.*)  " 'In reviewing the denial of a motion for nonsuit, appellate courts evaluate the evidence in the light most favorable to the plaintiff.  Reversal is [proper only] when no substantial evidence exists tending to prove each element of the plaintiff's case.' "  (*Laico v. Chevron U.S.A., Inc.* (2004) 123 Cal.App.4th 649, 659.)  "In determining whether the plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses.  Instead,

26

the evidence most favorable to [the] plaintiff must be accepted as true and conflicting evidence must be disregarded. The court must give 'to the plaintiff['s] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiff['s] favor.' " (*Campbell*, *supra*, 32 Cal.3d at p. 118.)

Able Engineering is thus partly correct that the denial of its nonsuit motion should be reviewed de novo, but Guerrero is also correct that our de novo review in this procedural context requires us to determine whether the record contains substantial evidence supporting her claim. At the same time, Able Engineering slightly misapprehends the relevant principles when it suggests that its concession of the truth of Guerrero's testimony affects the relevant standard of review. Our evaluation of the propriety of the trial court's ruling *requires* us to consider the evidence in the light most favorable to the plaintiff and to disregard conflicting evidence unfavorable to her case. (*Campbell, supra*, 32 Cal.3d at p. 118.) This standard applies regardless of Able Engineering's purported concession.[9]

B.   *Legal Standards Applicable to a Claim of Physical Disability Discrimination Under FEHA*

FEHA prohibits employers from discriminating against individuals "because of" a physical disability. (§ 12940, subd. (a).) FEHA's provisions are to be "construed liberally for the accomplishment of [its] purposes[.]" (§ 12993, subd. (a).) "The law of this state contains broad definitions of physical disability, mental disability, and medical condition. It is the intent of the Legislature that the definitions of physical disability and mental

---

9    Although Able Engineering asserts that it concedes the truth of Guerrero's trial testimony, its statement of facts portrays the evidence in the light most favorable to itself, and its arguments ignore evidence that supports Guerrero's claim.

27

disability be construed so that applicants and employees are protected from discrimination due to an actual or perceived physical or mental impairment that is disabling, potentially disabling, or perceived as disabling or potentially disabling." (§ 12926.1, subd. (b).)

"In the context of disability discrimination, the plaintiff initially has the burden to establish a prima facie case of discrimination. The plaintiff can meet this burden by presenting evidence that demonstrates, *even circumstantially or by inference*, that he or she (1) suffered from a disability, or was regarded as suffering from a disability[,] (2) could perform the essential duties of the job with or without reasonable accommodations, and (3) was subjected to an adverse employment action because of the disability or perceived disability." (*Sandell v. Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297, 310, italics added.)

C.     *Guerrero's Evidence Was Sufficient to Establish an Actual Physical Disability*

First, Able Engineering contends there was insufficient evidence at trial that Guerrero was actually physically disabled. It asserts that Guerrero's "subjective complaints that shoulder pain made her job more difficult" are not a physical disability within the meaning of section 12926, subdivision (m)(1). We disagree. And as we shall explain, this argument mischaracterizes the record and ignores evidence favorable to Guerrero.

The phrase "physical disability" has several definitions under FEHA. (See § 12926, subds. (m)(1) - (m)(5).) Relevant here, the statute defines "physical disability" to include "[h]aving any physiological disease, disorder, [or] condition" that both "[a]ffects one or more . . . body systems" (including the "musculoskeletal" system), and "[l]imits a major life activity." (§ 12926, subds. (m)(1)(A), (B).) " 'Major life activities,' " in turn, "shall be broadly construed and include[ ] physical, mental, and social activities and working."

28

(§ 12926, subd. (m)(1)(B)(iii).)  The regulations implementing FEHA provide that "[m]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, . . . reaching, lifting, . . . and working."  (Cal. Code Regs., tit. 2, § 11065, subd. (l)(1).)

"A physiological disease, disorder, condition, cosmetic disfigurement, or anatomical loss limits a major life activity if it makes the achievement of the major life activity difficult."  (§ 12926, subd. (m)(1)(B)(ii).)  " ' "FEHA does not require that the disability result in utter inability or even substantial limitation on the individual's ability to perform major life activities.  A limitation is sufficient." ' "  (*Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 345 (*Arteaga*).)  "Whether achievement of the major life activity is 'difficult' is an individualized assessment, which may consider what most people in the general population can perform with little or no difficulty, what members of the individual's peer group can perform with little or no difficulty, and/or what the individual would be able to perform with little or no difficulty in the absence of disability."  (Cal. Code Regs., tit. 2, § 11065, subd. (l)(3)(A).)

Further, whether a particular condition "limits" a major life activity "shall be determined without regard to mitigating measures such as medications, assistive devices, prosthetics, or reasonable accommodations, unless the mitigating measure itself limits a major life activity."  (§ 12926, subd. (m)(1)(B)(i); see Cal. Code Regs., tit. 2, § 11065, subd. (l)(3)(C) [" 'Limits' shall be determined without regard to mitigating measures or reasonable accommodations, unless the mitigating measure itself limits a major life activity."].)

Contrary to Able Engineering's portrayal of the evidence as establishing nothing more than that Guerrero suffered from subjective

complaints of pain—which suggests her symptoms lacked an underlying objective, physiological basis—there was ample evidence at trial that her persistent symptoms (which included not only pain but also limitations on her range of motion) stemmed from the shoulder injury she suffered in early 2010. As we have noted, "physical disability" under FEHA is to be construed broadly. In the seminal case of *Colmenares v. Braemar Country Club* (2003) 29 Cal.4th 1019, the California Supreme Court held that a " 'chronic back injury' " that limited the plaintiff's work activities qualified as a FEHA disability. (*Id.* at p. 1024.) We have little difficulty concluding the evidence was sufficient to establish that Guerrero's chronic shoulder injury likewise qualified as a "physiological . . . condition" that affected her "musculoskeletal" system, as required by section 12926, subdivision (m)(1)(A).

Of course, a physiological condition is disabling only if it "[l]imits a major life activity." (§ 12926, subd. (m)(1)(B).) Here, there was substantial evidence at trial that Guerrero's shoulder condition limited her in several major life activities. Notably, although Able Engineering presents Guerrero's evidence as mere "subjective complaints that [her] shoulder pain made her job more difficult," it does not dispute the truth of Guerrero's "complaints" about the limitations she experienced as a result of her pain. Indeed, it "*concedes the truth of Guerrero's testimony* and evidence at trial concerning her shoulder injury." (Italics added.) And under the relevant standard of review, Guerrero's testimony is sufficient evidence to support her claim. (*Campbell, supra,* 32 Cal.3d at p. 118.) Although Able Engineering no doubt means to undermine the conclusion that Guerrero's condition was disabling, effectively, its assertion operates as a concession, since working is a major life activity (§ 12926, subd. (m)(1)(B)(iii)), and FEHA requires only that a

30

condition "make[ ] the achievement of the major life activity difficult" (§ 12926, subd. (m)(1)(B)(ii)).

Moreover, we have reviewed the record and conclude substantial evidence supports the conclusion that Guerrero's chronic shoulder injury had disabling effects not only in her ability to work but in other major life activities as well.  Under the FEHA regulations, "[m]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, . . . reaching, lifting, . . . and working." (Cal. Code Regs., tit. 2, § 11065, subd. (l)(1).)  Guerrero testified the pain from her shoulder injury caused her to suddenly drop things, an indication she was impaired in her ability to perform the manual task of carrying.  She also testified she was limited in her ability to lift her injured arm, which, as her daughter testified, resulted in a noticeable reduction in her ability to reach.  Guerrero and her daughter indicated her ability to lift was impaired, including at work, where she had to ask for assistance in lifting heavy boxes.  Guerrero specifically noted that at work, it became "very difficult" to operate the heavy machine used to clean the lobby floors.  Thus, the evidence established that her shoulder injury made the major life activities of "manual tasks, . . . reaching, lifting, . . . and working" difficult for Guerrero, such that section 12926, subdivision (m)(1)(B), was satisfied.

Able Engineering argues Guerrero was not physically disabled because "she was able to complete her job successfully each day."  This ignores that whether a particular condition "limits" a major life activity "shall be determined without regard to mitigating measures such as medications, assistive devices, prosthetics, or reasonable accommodations, unless the mitigating measure itself limits a major life activity." (§ 12926, subd. (m)(1)(B)(i); see Cal. Code Regs., tit. 2, § 11065, subd. (n)(4) ["[m]itigating

31

measures include, but are not limited to . . . [l]earned behavioral . . . modifications"].)  Here, the evidence established that Guerrero was able to complete her work duties but only with modifications.  She testified her injury prevented her from lifting heavy boxes at all, and she required assistance for this task.  After Pollino told her she "had to use" the lobby floor polisher, she operated the machine mostly using her left arm, a behavioral modification.  She stated she was able to dust the walls by using an "extension."  Thus, while she was able to perform her work, she did so only with help or modifications; the evidence nevertheless demonstrated her shoulder injury made the accomplishment of these duties difficult.

Finally, Able Engineering argues "*Arteaga* is precisely on point" and compels the conclusion that Guerrero was not actually physically disabled. Not so.  The plaintiff in *Arteaga* worked for the Brink's armored vehicle service as a "messenger," which required him to account for "significant amounts of money on a daily basis." (*Arteaga*, *supra*, 163 Cal.App.4th at p. 335.)  While he was being investigated for cash shortages associated with runs where he had served as the messenger, the plaintiff for the first time complained of symptoms of " 'pain' and 'numbness' in his arms, fingers, shoulders, and feet." (*Id.* at p. 337.)  He had not previously disclosed these concerns and had not previously exhibited signs of a " 'medical problem[ ]' at work." (*Ibid.*)  Seven months earlier, he had visited a physician, was found to be in good health, and completed a medical form in which he indicated he "did not suffer from an 'impaired hand, arm, foot, leg, finger, [or] toe.' " (*Id.* at p. 347.)  "When Arteaga finally informed Brink's of his condition, a supervisor took him to a physician [twice] . . . .  Both times the physician found nothing wrong with Arteaga and sent him back to work without restrictions." (*Ibid.*)  After his termination, Arteaga was diagnosed with

carpal tunnel syndrome. (*Id*. at p. 340.) "This condition limited him in only one respect: He could no longer play soccer." (*Ibid*.) The trial court granted Brink's motion for summary judgment, and the appellate court affirmed. (*Id*. at pp. 334–335.)

In concluding Arteaga failed to present evidence of an actual physical disability, the Court of Appeal stressed the lack of evidence that his symptoms made accomplishing his job "difficult," and that the only limitation the plaintiff identified as a result of his symptoms was an inability to play soccer, "which is not a major life activity." (*Arteaga*, *supra*, 163 Cal.App.4th at p. 347.) The *Arteaga* court additionally emphasized that "[c]onsistent with the insignificance of his symptoms," plaintiff was seen by doctors before and at the time of his termination, and no physical disorders or conditions were discovered. (*Ibid*.)

Unlike the plaintiff in *Arteaga*, Guerrero's condition was not one of subjective "pain alone." Guerrero was not suffering from pain that lacked an identified underlying physiological condition; rather, she had a known shoulder injury that was the source of her chronic symptoms. Also, unlike the plaintiff in *Arteaga*, Guerrero repeatedly sought medical treatment for her shoulder injury. And during these appointments, Dr. Churchill identified physical abnormalities related to Guerrero's complaints of pain. Wong and others in upper management were made aware that Guerrero had "an ongoing personal medical condition with her shoulder" and that her doctor thought "she could have nerve damage." Thus, the medical "assessments" of plaintiff's pain that were lacking in *Arteaga* were present here, and the employer in this case was not required to choose between an employee's subjective complaints of pain on the one hand, and medical determinations of the employee's good physical health on the other. Moreover, whereas the

33

plaintiff in *Arteaga* was only limited in his ability to play soccer, Guerrero's condition impaired her ability to engage in a number of major life activities, as we have discussed.

Citing *Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34 (*Gelfo*), Able Engineering also contends Guerrero admitted to returning to work after her medical appointments with no formal medical restrictions, and this "constitutes an admission that she was not limited in her ability to work, and thus, not disabled[.]" *Gelfo* is inapposite. In *Gelfo*, the plaintiff experienced a back injury, but objected to the determination that he was disabled and insisted to his supervisors that he required no medical restrictions, his " 'back was fine,' " and he had no limitations in his ability to perform his work duties. (*Id.* at p. 47.) The Court of Appeal concluded plaintiff's protestations were judicial admissions supporting a directed verdict on the ground he did not have an actual physical disability. (*Id.* at p. 48.) Here, of course, Guerrero made no such admissions of good physical health; to the contrary, she continued to ask for help lifting boxes, and she told Wong her shoulder injury, though it happened years earlier, continued to be symptomatic and required ongoing medical treatment.

Able Engineering also cites *Sanders v. Arneson Prods.* (9th Cir. 1996) 91 F.3d 1351, 1354 (*Sanders*) for the proposition that " 'temporary, non-chronic impairments . . . with little or no long term or permanent impact are usually not disabilities.' " However, *Sanders* involved a claim of temporary *psychological* impairment under the Americans with Disabilities Act of 1990, and has no legal relevance to this case. Moreover, as we have discussed, the evidence established that Guerrero's shoulder injury had long-term effects; we therefore reject Able Engineering's premise that her condition was temporary.

In sum, we conclude there was substantial evidence at trial to support the conclusion that Guerrero was actually physically disabled within the meaning of section 12926, subdivision (m)(1).[10]

D.    *Guerrero's Evidence Was Sufficient to Establish That Able Engineering Knew She Was Physically Disabled*

Next, Able Engineering disputes the sufficiency of the evidence at trial to establish that it knew Guerrero had a physical disability. We reject this contention as well.

"An adverse employment decision cannot be made 'because of' a disability, when the disability is not known to the employer." (*Brundage v. Hahn* (1997) 57 Cal.App.4th 228, 236 [addressing claims of mental disability discrimination under the ADA, 42 U.S.C. § 12112(a), and FEHA].) "[A]n employer 'knows an employee has a disability *when the employee tells the employer about [the] condition, or when the employer otherwise becomes aware of the condition, such as through a third party or by observation*. The employer need only know the underlying facts, not the legal significance of those facts.' " (*Faust v. California Portland Cement Co.* (2007) 150 Cal.App.4th 864, 887, italics added.) To establish a claim of disparate treatment based on a physical disability, a plaintiff must produce evidence that the "employees who decided to discharge [her]" knew of her disability. (*Avila v. Continental Airlines, Inc.* (2008) 165 Cal.App.4th 1237, 1248.)

---

10    Able Engineering alternatively argues that Guerrero's evidence failed to establish a "record or history of" physical disability (§ 12926, subd. (m)(3)) or that it "regarded" Guerrero as "having, or having had" a physical disability (§ 12926, subd. (m)(4)). In her response brief on appeal, Guerrero does not attempt to refute these arguments. Because we find the evidence sufficient to establish that Guerrero was actually physically disabled (§ 12926, subd. (m)(1)), we need not and do not address Able Engineering's remaining contentions.

" 'While knowledge of the disability can be inferred from the circumstances, knowledge will only be imputed to the employer when the fact of disability is the only reasonable interpretation of the known facts. "Vague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the [FEHA]." ' " (*Ibid.*)

Able Engineering claims the trial evidence of its knowledge of Guerrero's physical disability fell short in four ways: (1) Guerrero's testimony that she informed Pollino about her shoulder injury was insufficient to hold Able Engineering liable, because Pollino had left its employ by the time Guerrero was discharged; (2) Guerrero's testimony that she told Budgell and Arellano about her trouble lifting boxes was insufficient because they were not employed by Able Engineering and asking for help lifting heavy boxes was consistent with temporary, non-disabling conditions, like a pulled muscle or backache; (3) Guerrero's requests to use accrued sick time for doctor's appointments were too nonspecific to inform Able Engineering of her physical disability; and (4) Guerrero's statements to Wong did not put him on notice of a physical disability. Because we disagree with the last contention, we need not and do not address the first three.

Contrary to Able Engineering's contention otherwise, the evidence at trial was sufficient to support the inference that Wong knew or should have known before her discharge that Guerrero was suffering from an actual physical disability within the meaning of section 12926, subdivision (m)(1).

First, Wong's testimony, together with the testimony of Guerrero and Hoeckelmann, established his knowledge that Guerrero was suffering from a "physiological . . . disorder" or "condition" that affected her "musculoskeletal" system. (§ 12926, subd. (m)(1)(A).) For instance, in response to Wong's questions toward the end of the May 23, 2016 meeting, Hoeckelmann and

36

Guerrero told Wong that Guerrero had been to the doctor because she was still suffering from pain from a shoulder injury she had suffered years earlier. He was also informed how the injury occurred, and that Guerrero's doctor thought she could have nerve damage. Wong admitted that upon receiving this information, his "red flags" went up and he was "concerned." Moreover, the company email sent on May 23, shortly after the disciplinary meeting, confirms Able Engineering's knowledge of Guerrero's physical disability. In that email, safety director Bury stated he "[j]ust got off the phone" with Wong and "evidently Maria Guerrero, janitor, has an ongoing personal medical condition with her shoulder. . . . her GP [general practitioner] is thinking she could have nerve damage, and that this could be work related."

Able Engineering argues that because Wong was not provided with Guerrero's specific diagnosis or prognosis, the evidence was insufficient to establish knowledge of a physical disability. However, it cites no legal authority indicating that FEHA imposes such a requirement. To the contrary, " '[t]he determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual.' " (*Arteaga*, *supra*, 163 Cal.App.4th at p. 348.) Further, "[w]hether an impairment limits a major life activity will usually not require scientific, medical, or statistical analysis." (Cal. Code Regs., tit. 2, § 11065, subd. (l)(3)(B).)

Here, the evidence was sufficient to demonstrate Wong was made aware that Guerrero had a years-old injury that was continuing to cause her pain, eliminating the possibility her condition was "mild" or had "little or no residual effects." (See Cal. Code Regs., tit. 2, § 11065, subd. (d)(9)(B) [Providing that " '[d]isability' does not include . . . conditions that are mild,

37

which do not limit a major life activity, as determined on a case-by-case basis. These excluded conditions have little or no residual effects, such as the common cold; seasonal or common influenza; minor cuts, sprains, muscle aches, soreness, bruises, or abrasions; non-migraine headaches, and minor and non-chronic gastrointestinal disorders."].) The additional detail that Guerrero was suffering from "severe rotator cuff tendonitis" would not have added anything material to the information already in Wong's possession.

Second, viewed in the light most favorable to Guerrero, the evidence at trial was sufficient to support the inference Wong knew or should have known that her shoulder injury limited her in the major life activities of lifting and working. (Cal. Code Regs., tit. 2, § 11065, subd. (l)(1).) Guerrero testified her injury made it difficult to lift heavy boxes because she could not raise her injured arm all the way. She also testified that after Pollino left Able Engineering, she shared her concerns about her limited ability to raise her arm and lift boxes with Wong, Budgell, and Arellano, and that "this [was] when they sent" an employee to assist her. Further, Able Engineering "concedes the truth of Guerrero's testimony and evidence at trial *concerning her . . . communications with her employer regarding her shoulder injury*." (Italics added.)[11]

---

[11]    As we have noted (see footnote 9, *ante*), notwithstanding this concession, Able Engineering focuses on the testimony and evidence that favors its position and ignores unfavorable facts. "A party who challenges the sufficiency of the evidence to support a finding must set forth, discuss, and analyze all the evidence on that point, both favorable and unfavorable." (*Doe v. Roman Catholic Archbishop of Cashel & Emly* (2009) 177 Cal.App.4th 209, 218.) Failure to adhere to this rule forfeits the issue. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) Of particular relevance here, although Able Engineering disputes the sufficiency of the evidence to establish its knowledge of Guerrero's limitations, it ignores Guerrero's testimony that she told Wong about her difficulty raising her arm and lifting

Further still, Wong's own testimony that he sympathized with Guerrero—after she told him about her shoulder injury, ongoing pain and possible nerve damage at the May 23, 2016 meeting—because he thought her shoulder injury was like his own injury from "lift[ing] weights" indicated that he related her injury to lifting. The evidence sufficiently established that Wong was informed of Guerrero's limited ability to lift boxes and difficulty raising her arm and knew or should have known of this limitation.

Guerrero additionally argues that her supervisors "were aware that her shoulder condition was worsening in 2016, requiring further medical intervention." "Repeated or extended absences from work may constitute a limitation on the major life activity of working." (*Soria v. Univision Radio Los Angeles, Inc.* (2016) 5 Cal.App.5th 570, 588 [treatment for plaintiff's asymptomatic tumor prevented her from coming to work, thus limiting her in the major life activity of working].) The evidence established Wong was informed, at the May 23, 2016 meeting, that Guerrero had taken time off work to seek treatment for her shoulder injury, and that she would be taking time off again on June 2 for the same reason. At that meeting, Wong told Hoeckelmann, "I noticed your mom's been taking *a lot of sick time* for doctor's appointments." (Italics added.) Hoeckelmann explained to Wong that her mother was "going [to the doctor] because she still has pain in her arm from when she hurt it." Wong was further informed that although Guerrero's injury had occurred years earlier, it was causing ongoing symptoms, and that she had possible nerve damage related to the injury—information which

_____

boxes and portrays her testimony as though she only communicated these concerns to Budgell and Arellano. Able Engineering's failure to characterize the record accurately and acknowledge all of the relevant evidence results in a forfeiture of the issue. And as we discuss, Able Engineering's challenge fails on the merits notwithstanding the forfeiture.

Wong immediately shared with Able Engineering's upper management.  It can be reasonably inferred from this evidence that Wong was aware Guerrero's shoulder injury was a condition that had led and would continue to lead to repeated absences from work, thus further limiting her in the major life activity of working.

In sum, we reject Able Engineering's contention that there was insufficient evidence at trial to support the inference that it knew of Guerrero's disabling physical condition.

E.      *Guerrero's Evidence Was Sufficient to Prove Causation*

Able Engineering also contends Guerrero's evidence was insufficient to prove causation, arguing that it had no choice but to lay Guerrero off because it had lost its contract with JLL.  This contention lacks merit as well.

1.      *Background*

In its motion for nonsuit, Able Engineering challenged the sufficiency of the trial evidence to show that discrimination was the cause of its adverse actions against Guerrero.  Citing *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203 (*Harris*), for the proposition that a plaintiff is required to prove that " ' "discrimination was a substantial motivating factor" ' " for the " ' "disputed employment decision" ' " in order to prevail on a discrimination claim, Able Engineering argued Guerrero's evidence failed to establish that her physical disability was a substantial motivating reason for "her discharge (or any other disciplinary action taken against her)."

On appeal, Able Engineering claims in its opening brief that the trial court erred in denying its motion for nonsuit "on the element of causation and discriminatory animus."  However, its argument on appeal has been altered and is now narrower than the argument it presented in the trial court.  Unlike its nonsuit motion in which it discussed its discipline and discharge of

Guerrero, on appeal Able Engineering focuses exclusively on her discharge. Also, unlike its nonsuit motion in which it asserted that Guerrero's evidence failed to demonstrate that her physical disability was a "substantial motivating reason" for its adverse actions, on appeal it no longer makes this contention. It no longer cites *Harris*, and the phrases "substantial motivating factor" or "substantial motivating reason" do not appear in its opening brief.

Instead, Able Engineering focuses only on establishing that its discharge of Guerrero was legitimately motivated by its loss of contract with JLL. It contends Wong had no option but to lay Guerrero off given the loss of contract and denies Wong had control over whether she "would stay on at the Plaza." After discussing the evidence of its loss of the JLL contract and Wong's purported inability to do anything but lay Guerrero off as a result, Able Engineering concludes "[t]here was no evidence that the decision to lay Guerrero off was based on discriminatory animus," and the trial court therefore erred in denying its motion.

Guerrero responds that she prosecuted this action under a "mixed-motive" theory, under which a plaintiff need only show the discrimination in question was a substantial motivating factor for the adverse employment action, even if it was not the only reason for the adverse action. She also disputes Able Engineering's factual contention that it had no alternative but to terminate Guerrero's employment, arguing the evidence showed it could have transferred her to Able Building instead. We agree with Guerrero on both contentions.

2.    *Legal Standards for Proving Causation in Mixed-Motive Discrimination Cases*

"In FEHA employment discrimination cases that do not involve mixed motives, [California] [has] adopted the three-stage burden-shifting test established by *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792[.]"

41

(*Harris*, *supra*, 56 Cal.4th at p. 214.)  Under the *McDonnell Douglas* test, "a plaintiff has the initial burden to make a prima facie case of discrimination by showing that it is more likely than not that the employer has taken an adverse action based on a prohibited criterion.  A prima facie case establishes a presumption of discrimination.  The employer may rebut the presumption by producing evidence that its action was taken for a legitimate, nondiscriminatory reason.  If the employer discharges this burden, the presumption of discrimination disappears.  The plaintiff must then show that the employer's proffered nondiscriminatory reason was actually a pretext for discrimination, and the plaintiff may offer any other evidence of discriminatory motive.  The ultimate burden of persuasion on the issue of discrimination remains with the plaintiff." (*Harris*, at pp. 214–215, citing *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354–356.)

For mixed-motive cases, the California Supreme Court has established a different legal framework.  As the court explained in *Harris*, the *McDonnell Douglas* framework "presupposes that the employer has a single reason for taking an adverse action against the employee and that the reason is either discriminatory or legitimate.  By hinging liability on whether the employer's proffered reason for taking the action is genuine or pretextual, the *McDonnell Douglas* inquiry aims to ferret out the 'true' reason for the employer's action. In a mixed-motives case, however, there is no single 'true' reason for the employer's action." (*Harris*, *supra*, 56 Cal.4th at p. 215.)  In other words, in mixed-motive cases "there is no single reason for an employer's adverse action, and a discriminatory motive may have influenced otherwise legitimate reasons for the employment decision." (*Husman v. Toyota Motor Credit Corp.* (2017) 12 Cal.App.5th 1168, 1182.)

In *Harris*, our high court established the pertinent test for proving causation in a mixed-motives case. It did so through interpretation of the phrase "because of" in section 12940, subdivision (a), which makes it unlawful for an employer to discriminate against an individual "because of" a protected characteristic.[12] (*Harris*, *supra*, 56 Cal.4th at p. 214.) The court found this phrase susceptible to three possible meanings: "(1) discrimination was a 'but for' cause of the employment decision, (2) discrimination was a 'substantial factor' in the decision, and (3) discrimination was simply 'a motivating factor'[.]" (*Id.* at p. 217.) The court found " 'but-for' " causation too onerous and inconsistent with FEHA's purpose of punishing and deterring discriminatory conduct. (*Id.* at pp. 229–230 [noting "it is important to recognize that discrimination can be serious, consequential, and even by itself determinative of an employment decision without also being a ' "but for' " cause"].)

At the same time, it rejected the possibility of a plaintiff recovering under FEHA on the basis of discrimination that is merely "a motivating factor" in a decision, reasoning under such a standard "the causation

---

[12] Section 12940, subdivision (a), provides in relevant part as follows: "It is an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California: (a) For an employer, because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or veteran or military status of any person, to refuse to hire or employ the person or to refuse to select the person for a training program leading to employment, or to bar or to discharge the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions, or privileges of employment."

requirement in section 12940[, subdivision] (a) would be eviscerated" and create the possibility of liability based on mere stray remarks. (*Harris, supra,* 56 Cal.4th at p. 231.) Instead, the court found the substantial factor test most appropriate, reasoning, in part, that it "triggers the deterrent purpose of the FEHA and thus exposes the employer to liability, even if other factors would have led the employer to make the same decision at the time." (*Id.* at p. 232.)

The *Harris* court also considered the related question of the legal consequences that should "flow from an employer's proof that it would have made the same employment decision in the absence of any discrimination." (*Harris, supra*, 56 Cal.4th at p. 224.) In particular, it considered whether a same-decision showing by an employer should result in a complete defense to liability, or whether such a showing should merely limit the plaintiff's available remedies. (*Id.* at pp. 224–232.) The court decided that an employer's same-decision showing should not immunize the employer from liability. (*Id.* at p. 229.) Rather, "proof that discrimination was a *substantial* factor in an employment decision triggers the deterrent purpose of the FEHA and thus exposes an employer to liability, even if other factors would have led the employer to make the same decision at the time." (*Id.* at p. 232.) The court held instead that in the event the employer shows it had a legitimate reason for its decision, and succeeds in making a same-decision showing, the plaintiff's remedies will be limited: the plaintiff will not be able to recover damages, but will be able to recover declaratory and injunctive relief, and will be eligible for attorney fees. (*Id.* at pp. 232–235.)

The court summarized its holding as follows: "When a plaintiff has shown by a preponderance of the evidence that discrimination was a substantial factor motivating his or her termination, the employer is entitled

44

to demonstrate that legitimate, nondiscriminatory reasons would have led it to make the same decision at the time. If the employer proves by a preponderance of the evidence that it would have made the same decision for lawful reasons, then the plaintiff cannot be awarded damages, backpay, or an order of reinstatement. However, where appropriate, the plaintiff may be entitled to declaratory or injunctive relief. The plaintiff also may be eligible for an award of reasonable attorney[ ] fees and costs under section 12965, subdivision (b)." (*Harris*, *supra*, 56 Cal.4th at p. 241.)

3. *Analysis*

As Guerrero points out, she prosecuted her claim for disability discrimination under a mixed-motives theory.[13] Therefore, the *Harris* causation framework applies. Under *Harris*, "[w]hen a plaintiff has shown by a preponderance of the evidence that discrimination was a substantial factor motivating his or her termination, the employer is entitled to demonstrate that legitimate, nondiscriminatory reasons would have led it to make the same decision at the time." (*Harris*, *supra*, 56 Cal.4th at p. 241.) Able Engineering's appeal, however, ignores the first part of this test.

_____

[13] The jury was instructed under CACI 2512 (Limitation on Remedies — Same Decision) that if it found that disability discrimination was a substantial motivating reason for Guerrero's discharge, but also found that Able Engineering succeeded in proving that its loss of contract with JLL was also a substantial motivating reason, that it must determine whether Able Engineering would have discharged Guerrero anyway "even if [it] had not also been substantially motivated by discrimination." It was further instructed that if it found Guerrero would have been laid off "anyway . . . due to loss of the contract" with JLL, that she would not be entitled to reinstatement, back pay, or damages. (See *Davis v. Farmers Ins. Exchange* (2016) 245 Cal.App.4th 1302, 1320–1321 [noting that the Judicial Council added CACI 2512 following the California Supreme Court's decision in *Harris*].)

On appeal, Able Engineering only discusses the evidence of its legitimate reasons for laying Guerrero off, ignoring Guerrero's evidence of discriminatory animus. Under *Harris*, however, proof of an employer's "legitimate, nondiscriminatory reasons" for an adverse action, even if sufficient to show the employer would have made the same decision notwithstanding alleged discrimination, is not a defense to liability for discrimination.[14] (*Harris*, *supra*, 56 Cal.4th at pp. 225, 241.) Able Engineering's failure to challenge the sufficiency of Guerrero's evidence to meet her burden of proof under *Harris* is fatal to its ability to demonstrate reversible error. Although Able Engineering challenged the sufficiency of Guerrero's evidence to show that discrimination was a substantial motivating factor for her discharge in the trial court, it has not reprised that argument on appeal.

Missing from its appellate briefs is any contention that Guerrero failed to meet her burden to show that discriminatory animus played a substantial motivating role in its termination decision or any other adverse decision. Although it asserts in the concluding paragraph of the relevant section of its opening brief that "[t]here was no evidence that the decision to lay Guerrero off was based on discriminatory animus," this assertion is both undeveloped and unaccompanied by citations to the record, and is not an adequate

---

[14] In its special verdict, the jury determined that "Guerrero's physical disability [was] a substantial motivating reason for [the] adverse employment action" by Able Engineering, and that "the termination of Able Engineering's contract with JLL [was] also a substantial motivating reason" for Able Engineering's decision to discharge Guerrero. The jury also found that Able Engineering would not have discharged Guerrero "anyway at that time based on the termination of Able Engineering's contract with JLL, had [it] . . . not also been substantially motivated by discrimination[.]"

46

appellate argument. (See, e.g., *WFG National Title Ins. Co. v. Wells Fargo Bank, N.A.* (2020) 51 Cal.App.5th 881, 894 ["In order to demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record," and the failure to adhere to these principles leads to forfeiture of the unsupported argument].) In its reply brief, Able Engineering states in a heading that "Guerrero [f]ailed [t]o [e]stablish [t]hat [d]isability [w]as [a] [s]ubstantial [m]otivating [r]eason [f]or Wong's [d]ecision [t]o [d]ischarge [h]er." However, after previewing this contention, Able Engineering fails to address it in the discussion that follows. Even if a statement in a heading could be considered an adequate appellate argument (and it cannot), Able Engineering fails to explain its failure to raise the point sooner. (See *Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 [claims raised for first time in a reply brief, without good cause, are forfeited]; accord *Aerotek, Inc. v. Johnson Group Staffing Co., Inc.* (2020) 54 Cal.App.5th 670, 689.)

Given these deficiencies in its appellate briefing, we are constrained to conclude that Able Engineering has forfeited any challenge to the sufficiency of Guerrero's evidence at trial to establish that discriminatory animus was a substantial factor that motivated its decision to discharge her. It therefore fails to present an argument capable of establishing that the trial court erred in denying its motion for nonsuit on the element of causation.

It is possible Able Engineering means to argue that its termination decision was singularly motivated, and that the loss of contract foreclosed the possibility of its decision being affected by any other motivation, making this something other than a true mixed-motives case and removing it from the analytical realm of *Harris*. If so, it has forfeited this position by failing to articulate it in its appellate briefs. (*Orange County Water Dist. v. Sabic*

*Innovative Plastics US, LLC* (2017) 14 Cal.App.5th 343, 383 [" ' " 'When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived.' " ' "].) Moreover, because this was not the theory on which Able Engineering sought nonsuit, it cannot be considered on appeal. (See *Carson*, *supra*, 36 Cal.3d at p. 839 ["Only the grounds specified by the moving party in support of its motion should be considered by the appellate court in reviewing a judgment of nonsuit."].) Although an exception to this rule exists, Able Engineering has made no attempt to establish that it applies here. (See *Lawless v. Calaway* (1944) 24 Cal.2d 81, 94 [holding that new theories may be considered for the first time on appeal only if "it is clear that the defect is one which could not have been remedied had it been called to the attention of the plaintiff by the motion"].)

Moreover, in addition to suffering from these fatal procedural flaws, Able Engineering's argument also lacks substantive merit. Citing the loss of contract with JLL, Able Engineering argues the evidence demonstrated Wong had no alternative but to lay Guerrero off. We find its argument unpersuasive, for two reasons.

First, in opting to discuss only its reasons for terminating Guerrero, Able Engineering ignores the evidence of other adverse actions it took against her. FEHA makes it unlawful for an employer to discriminate against a person "in terms, conditions, or privileges of employment." (§ 12940, subd. (a).) "Th[is] prohibition is often restated in judicial opinions as a requirement that the discriminatory action result in 'adverse employment action.' " (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 373 (*Horsford*).) "[C]hanges in terms and conditions of employment must be both substantial and detrimental to be actionable."

48

(*Ibid.*)  Negative performance reviews, and suspensions from duty with and without pay, qualify as adverse employment actions.  (See *id.* at p. 374.)  In moving for nonsuit, Able Engineering sought to establish that not only its discharge but also its other "disciplinary action[s] taken against her" were not substantially motivated by discrimination.

Although the trial court summarily denied the motion for nonsuit as to Guerrero's FEHA claim without articulating its reasons, on appeal, the judgment is presumed correct, and "all intendments and presumptions are indulged in favor of correctness." (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 58.)  We thus infer that the court, in denying the motion, found the evidence sufficient to establish that all the adverse actions addressed in the motion, not only Guerrero's discharge but also the discipline administered by Wong, arose from discriminatory animus.  Thus, even if Able Engineering's factual premise were correct and the evidence established that Wong had no option but to discharge Guerrero, this still leaves open the possibility that the other adverse actions on which the trial court's ruling was impliedly based resulted from discrimination.  It is the appellant's burden to demonstrate reversible error (*ibid.*), and yet Able Engineering fails to discuss, let alone demonstrate, that these other actions were not unlawfully motivated.  Able Engineering thus falls short of establishing that the error it identifies on appeal justifies overturning the judgment.

Second, we reject the factual premise underlying Able Engineering's appellate challenge to Guerrero's discrimination claim, namely that discharge was the only employment action available to Wong.  Viewing the evidence and all resulting inferences in the light most favorable to Guerrero, the evidence at trial demonstrated that Wong had the ability and authority to transfer janitorial staff from Able Engineering to Able Building, and that he

49

could have transferred Guerrero to Able Building in 2016, as he did for Salazar, when the contract with JLL ended rather than merely discharge her.[15]  Both Wong and Guerrero testified that in 2010, he "transitioned over" or "switched" her employment "over from one Able company to another Able company."  When he did so, he referred to the action as a "Company change" in the associated form.

Further supporting the inference that a direct transfer of janitors from one company to the other in 2016 was not only possible but anticipated, Wong testified the point of instructing Guerrero to begin reporting to Budgell and Arellano during the period before JLL officially awarded the day porter contract to Able Building was, according to Wong, that "they would be putting [the day porters] over on to the [other] side where . . . Nataly and Gregg would be their supervisors."  Based on the record, Wong then transferred Salazar, one of the two janitors, from Able Engineering to Able Building in 2016, after it terminated Guerrero.  When it did so, Wong told Salazar she was being transferred and filled out the "transfer" paperwork for

---

[15]    Guerrero appears to argue the evidence at trial supported disregarding the separate corporate existence of Able Engineering and Able Building.  Able Engineering responds that because Guerrero did not sue Able Building, did not allege in her operative complaint that Able Building was an alter ego of Able Engineering, and did not request a jury instruction on an alter ego theory of liability at trial, that she has not properly preserved this theory for consideration on appeal.  On this point, we agree with Able Engineering. (See *Mattco Forge, Inc. v. Arthur Young & Co.* (1997) 52 Cal.App.4th 820, 847 ["[P]arties are not permitted to ' "adopt a new and different theory on appeal. To permit [them] to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant." ' "].)  Thus, we focus on the actions or inactions of Wong, who undisputedly was an agent of Able Engineering, and determine their effect, if any, on the liability of Able Engineering.

50

her.  Moreover, Salazar was still working at the Plaza as an employee of Able Building at the time of trial.  Although Wong denied he had the authority to transfer employees, the applicable standard of review requires us to disregard conflicting evidence unfavorable to Guerrero.  (*Campbell*, *supra*, 32 Cal.3d at p. 118.)  The evidence was thus sufficient to support the inference that Wong had the ability and authority to transfer Guerrero to Able Building rather than discharge her but declined to exercise that authority on her behalf.

For all of these reasons, we reject Able Engineering's challenge to the trial court's denial of its motion for nonsuit on the issue of causation.

## II.

### *There Was Substantial Evidence That Wong Was a "Managing Agent" Under Civil Code Section 3294, Subdivision (b)*

Able Engineering's motion for nonsuit sought to dispose of Guerrero's punitive damages claim, in part on the basis that Guerrero had presented "no evidence" that Wong was a managing agent within the meaning of Civil Code section 3294, subdivision (b), to support corporate liability for punitive damages.  The trial court denied the motion, explaining it had concluded that the managing agent who was "the focus of . . . *White vs. Ultramar* [(1999) 21 Cal.4th 563 (*White*)] was nearly identical to Mr. Wong's position[.]"  In its motion for JNOV, Able Engineering again argued there was "no record evidence" to support the finding that Wong was a managing agent.  The court summarily denied this motion.  Able Engineering seeks to overturn the trial court's denial of its nonsuit and JNOV motions as to corporate liability for punitive damages on the same basis asserted in the trial court.

A.    *Standard of Review*

The same standard of review applies to the court's denial of Able Engineering's motion for nonsuit and JNOV motions.  "Rulings on motions for

51

nonsuit and for [JNOV] are reviewed for the existence of substantial evidence" (*OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th 835, 845), considering the trial evidence " 'in the light most favorable to the plaintiff . . . indulging in every legitimate inference which may be drawn from the evidence[.]' " (*M&F Fishing, supra*, 202 Cal.App.4th at p. 1532 [nonsuit motion]; *Brennan*, *supra*, 199 Cal.App.4th at p. 1345 [review of a ruling on a JNOV motion requires the appellate court to view the evidence " ' "in the light most favorable to the party securing the verdict" ' "].)  Because the finding challenged on appeal was "subject to a heightened burden of proof, we review the record in support of these findings in light of that burden.  Thus, we inquire whether the record contains ' " 'substantial evidence to support a determination by clear and convincing evidence[.]' " ' " (*Colucci v. T-Mobile USA, Inc.* (2020) 48 Cal.App.5th 442, 451 (*Colucci*).)

B.    *Additional Factual Background*

In 2015 and 2016, Wong's role as regional manager (or account manager) for Able Engineering put him in charge of 25 properties, and anywhere from 60 to 80 employees, in San Diego and Orange Counties.  His responsibilities included reviewing engineers in the field; fulfilling human resources and payroll needs; and interviewing, hiring, firing, and disciplining employees.  The individuals he supervised were charged with maintaining the electrical, plumbing, HVAC, and automation systems in each building.  The chief engineers and assistant chief engineers of the buildings in his territory reported to him.  During the relevant time, Pollino, an Able Engineering chief engineer, was Guerrero's direct supervisor and he reported to Wong.  Wong, in turn, reported to Romeo Sesto, Able Engineering's vice president.

Wong had discretion over the level of discipline to impose on any particular employee. If he believed the employee's "violation" was not "egregious," or if they "understood the cha[r]ges [and] . . . what they did wrong," he would just "talk to that person" and "leave it alone." He would "step it up" and issue a written warning that would escalate to suspension if "the behavior continued" or if he believed there had been a violation of company policies. If a problem with an employee was reported to him, Wong explained: "[I]f I had to go and talk to our employee, and verbally just kind of make sure that things . . . were done without having to write it up, then that was my discretion. If it was something that was egregious or something that was a little bit more important, then that was my, [*sic*] you know, to do a write-up[.]"

At trial, counsel for Able Engineering emphasized that at each juncture when Wong disciplined Guerrero, his choice of discipline reflected the exercise of his discretion. Able Engineering brought Wong's testimony at trial to a conclusion by asking him just two questions during his redirect examination:

> "Q. Mr. Wong, with respect to Miss Guerrero, you had discretion with regards to what discipline to implement?
>
> "A. Yes.
>
> "Q. And do you believe that you exercised that discretion appropriately?
>
> "A. Yes, I did."

C. *Analysis*

Civil Code section 3294, subdivision (b), provides in pertinent part that "[a]n employer shall not be liable for damages pursuant to subdivision (a), based upon acts of an employee of the employer, unless the employer . . . was

53

personally guilty of oppression, fraud, or malice. With respect to a corporate employer, the . . . act of oppression, fraud, or malice must be on the part of an officer, director, or *managing agent* of the corporation." (Italics added.)

There is no statutory definition of "managing agent." (See *Colucci*, *supra*, 48 Cal.App.5th at p. 451.) However, "[i]n the seminal case of [*White*, *supra*, 21 Cal.4th 563], our high court construed managing agent as follows: '[T]he Legislature intended that principal liability for punitive damages not depend on employees' managerial level, but on the extent to which they exercise substantial discretionary authority over decisions that ultimately determine corporate policy. Thus, supervisors who have broad discretionary powers and exercise substantial discretionary authority in the corporation could be managing agents. Conversely, supervisors who have no discretionary authority over decisions that ultimately determine corporate policy would not be considered managing agents even though they may have the ability to hire or fire other employees. In order to demonstrate that an employee is a true managing agent under section 3294, subdivision (b), a plaintiff seeking punitive damages would have to show that the employee exercised substantial discretionary authority over significant aspects of a corporation's business.' " (*Colucci*, *supra*, 48 Cal.App.5th at p. 451, quoting *White*, *supra*, 21 Cal.4th at pp. 576–577.)

In its opening brief on appeal, Able Engineering asserted that in *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 715 (*Roby*), the California Supreme Court "clarified" its decision in *White* and held that the phrase " 'corporate policy' " means the " 'formal policies that affect a substantial portion of the company and that are the type likely to come to the attention of corporate leadership.' " It argued the trial court erred in denying its nonsuit and JNOV

54

motions because Guerrero failed to present evidence that Wong possessed discretionary authority to "determine formal corporate policy."

After Able Engineering filed its opening brief, this court decided *Colucci*. In *Colucci*, T-Mobile, the plaintiff's corporate employer, had also argued that in *Roby*, the Supreme Court limited the holding of *White*. (*Colucci*, *supra*, 48 Cal.App.5th at p. 452.) We rejected T-Mobile's argument, noting that in *Roby* the court "was not reviewing whether substantial evidence supported the jury's decision to award punitive damages, but rather the constitutionality of the amount of the jury's award." (*Id.* at pp. 452–453.) We concluded that "[r]ead in context and considering what was actually at issue in *Roby*, we do not believe the California Supreme Court intended to modify or limit *White*'s careful formulation of the managing agent test." (*Id.* at p. 453.)

Applying the *White* managing agent test, we then concluded that "Robson," the T-Mobile district manager responsible for terminating the plaintiff employee, was a managing agent within the meaning of Civil Code section 3294, subdivision (b). We found the facts of *White* "practically indistinguishable." (*Colucci*, *supra*, 48 Cal.App.5th at p. 452.)

In *White*, the high court concluded that " 'Salla' " was a managing agent of corporate defendant Ultramar. "Ultramar owned convenience stores at gas stations throughout California. [Citation.] Salla was a 'zone manager,' responsible for managing eight stores in the San Diego area and at least 65 employees. [Citation.] Individual store managers reported to her. [Citation.] Salla's superiors 'delegated most, if not all, of the responsibility for running these stores to her. The fact that Salla spoke with other employees and consulted the human resources department before firing plaintiff does not detract from her admitted ability to act independently of those sources.'

55

[Citation.]  In managing numerous stores on a daily basis and making significant decisions affecting both store and company policy, the court concluded that 'Salla exercised substantial discretionary authority over decisions that ultimately determined corporate policy[.]' " (*Colucci, supra*, 48 Cal.App.5th at pp. 451–452, discussing *White, supra*, 21 Cal.4th at pp. 577, 580.)

Similarly, Robson was "responsible for managing nine retail stores and 100 employees" and "had independent, final authority to hire or fire employees within his district; indeed, he alone decided to fire Colucci. Further, as in *White*, Robson had substantial discretionary authority over daily store operations, which led to the ad hoc formulation of policy. For example, Robson decided whether and where to transfer employees; whether to institute disciplinary measures; and whether and how to investigate employees' reported concerns. These decisions affected company policy over a significant aspect of T-Mobile's business." (*Colucci, supra*, 48 Cal.App.5th at p. 452.)

We further noted that Robson had substantial discretionary authority to override general policy, citing as examples that Robson had discharged Colucci in contravention of the company's progressive discipline policy and had sent Colucci a letter in violation of a company communication policy, indicating Robson had authority to "situationally deviate." (*Colucci, supra*, 48 Cal.App.5th at p. 454.)  "Accordingly," we concluded, "Robson formulated operational policies through his discretionary decisions." (*Ibid.*, citing *White, supra*, 21 Cal.4th at p. 577.)

Able Engineering attempts to distinguish *Colucci* in its reply brief, which was filed after *Colucci* was decided, arguing the trial evidence failed to establish that Wong had authority to override company policy or create ad

hoc operational policies through his discretionary decisions.  We disagree and find both *Colucci* and *White* factually on point with this case.

The breadth and scope of Wong's responsibilities at Able Engineering were very similar to the responsibilities of the managing agents in *White* and *Colucci*.  Wong supervised between 60 and 80 chief engineers, assistant chief engineers, and maintenance employees in 25 buildings serviced by Able Engineering.  Pollino, a chief engineer, had supervisory duties and reported to Wong, who in turn reported to Sesto, a vice president of Able Engineering.  (See *White*, *supra*, 21 Cal.4th at p. 577; *Colucci, supra*, 48 Cal.App.5th at p. 452.)  Based on our review of the record, Wong alone investigated allegations of employee misconduct and made decisions to hire, discipline, fire, or transfer employees under his supervision; indeed, Able Engineering's counsel emphasized at trial that Wong had discretion in deciding the level of discipline to impose on Guerrero and that the discipline imposed at each juncture reflected his exercise of that discretion.

As in *Colucci*, the record supports the conclusion that Wong formulated ad hoc operational policies through his discretionary decisions.  For example, he presented his practice of refraining from giving employees advance notice of an upcoming loss of contract as his own decision based on a preference to avoid employee "angst, . . . questions, [and] feelings . . . about their jobs . . ." that resulted from providing them the information ahead of time.  As another example, the record reflects that the processes by which Wong investigated, adjudicated and punished allegations of misconduct varied, depending on his discretion.  He found Guerrero guilty of misconduct and disciplined her at times without fully informing her of the nature of the accusations against her, and sometimes without fully investigating the allegations, in a process most fittingly described as ad hoc.

57

And while Wong explained that some of his disciplinary decisions were guided by "normal" company policies of issuing verbal warnings for less serious violations, and escalating to written warnings or suspensions in the case of policy violations or "egregious" behavior, it was apparent that as in *Colucci*, Wong could, and did, "situationally deviate." (*Colucci, supra*, 48 Cal.App.5th at p. 454.) For example, he gave Guerrero a written disciplinary warning for sharing "confidential" bonus information in February 2016, and yet there was no indication that this behavior (assuming it occurred, which Guerrero denied) violated any company policy, was "egregious," or amounted to misconduct at all, since Guerrero was not told prior to receiving the written warning that she should not tell anyone about her bonus.[16] Wong also testified that he elected not to fully investigate Salazar's and Perez's accusations against Guerrero, purportedly because completing the investigation would generate information that would require him to terminate Guerrero for cause, which he did not want to do.

---

[16] At oral argument, Able Engineering's counsel highlighted an argument from their reply brief that Wong's decision to discipline Guerrero for sharing bonus information with JLL employees was made pursuant to a written company rule stating that "[d]isciplinary action, including termination of employment, may result for breach of any of the following: . . . h) [a]ny other behavior, which is detrimental to Able Engineering Services' business, disruptive to Able Engineering Services in its relationships with clients, or to other Able Engineering Services employees" and another rule requiring employees to "deal professionally" with other site employees. This appeal is the first time Able Engineering has offered these rules as the justification for Wong's disciplinary decision. This new justification is belied by the trial evidence, as neither rule was mentioned to Guerrero, or stated in the warning slip issued to her, as the reason for her discipline. In any event, as we discuss *post*, far from establishing a limitation on Wong's discretion, this evidence further establishes the breadth of Wong's managerial authority.

The evidence also established that Wong was authorized to make, and did make, discretionary decisions on behalf of Able Engineering for reasons that were client-driven. For instance, he testified that he moved Guerrero from Able Building back to Able Engineering in January 2011 at the request of the property manager, who "asked [him] to bring her back on to the engineering side" after Guerrero complained about the negative impact of the transfer on her medical benefits. In 2015, at JLL's behest, he changed the established procedure of allowing day porters to request time off verbally and began requiring written requests.

As we have noted (footnote 16, *ante*), Able Engineering maintains that Wong's disciplinary authority extended to enforcing a company rule that barred employees from engaging in "[a]ny . . . behavior, which is detrimental to Able Engineering Services' business, [or] disruptive to Able Engineering Services in its relationships with clients." While Able Engineering cites this rule to show Wong's disciplinary decisions were tethered to a corporate rule, we disagree that the rule demonstrates a limit on Wong's discretion. To the contrary, the rule is so broad and standardless that it effectively allows the person enforcing it (here, Wong) to create standards of conduct for Able Engineering employees in response to client demands.

In sum, the evidence at trial demonstrated that Wong possessed a substantial level of discretionary authority that permitted him to formulate operational policies in response to client needs and requests, thus allowing Able Engineering to maintain positive client relationships. Like the managing agents in *White* and *Colucci*, his decisions affected company policy over significant aspects of Able Engineering's business. (See *White, supra,* 21 Cal.4th at p. 577 [concluding that Salla "exercised substantial discretionary authority" and made "significant decisions affecting both store policy and

59

company policy"]; *Colucci, supra*, 48 Cal.App.5th at p. 452 [Robson's "decisions affected company policy over a significant aspect of T-Mobile's business"].)

We therefore conclude that substantial evidence supports the determination by clear and convincing evidence that Wong was a managing agent within the meaning of section 3294, subdivision (b).

III.

*The Trial Court Applied an Incorrect Legal Standard in Declining to Apply a Multiplier to the Lodestar Fee Award Under FEHA*

A.    *Additional Background*

After judgment was entered, Guerrero moved for an award of attorney fees as the prevailing party in a FEHA action, pursuant to section 12965, subdivision (b).  She sought to recover hourly rates of between $400 and $800 for her attorneys and $200 for her paralegal, and submitted declarations of counsel from the local plaintiffs' bar in support of these rates.  She asserted that more than 1000 hours had been billed to her case, and that the resulting lodestar (the multiple of reasonable fees times reasonable hours) was $553,835.  She then asked the court to multiply the lodestar by 2.0 to account for the fact that her counsel had litigated the case on contingency and had advanced hours and costs but "ha[d] yet to recover anything after over two years of strenuous litigation"; that her counsel's devotion to her case precluded them from taking other cases; to reflect the difficulty of the litigation; and based on the level of skill her counsel had displayed.  The total requested fee award was $1,107,671.

In opposition, Able Engineering did not dispute Guerrero's entitlement to attorney fees, but it argued the amount she sought was excessive.  It submitted declarations from local employment attorneys who averred that the prevailing local rate for employment matters taken on a non-contingent

60

basis was lower than the rate sought by Guerrero's counsel. Able Engineering thus argued the court should award attorney fees at a rate of no more than between $250 and $500 per hour, and paralegal fees at no more than $90 per hour. It also argued the number of hours reportedly spent on Guerrero's case were unreasonable. Finally, it opposed the request for a multiplier, arguing the factors cited by Guerrero's counsel did not justify enhancing the fee award.

In a subsequent minute order, the trial court granted the fee request in part and denied it in part. The court found the claimed hours to be generally reasonable, but lowered the requested hourly rates on the basis that the declarations supporting Guerrero's motion reflected "contingency rates," whereas the lodestar is supposed to be calculated using hourly rates for noncontingent litigation. It awarded fees at $300 and $600 per hour for Guerrero's attorneys, and $110 per hour for her paralegal.

However, the court denied Guerrero's request for a multiplier, stating: "Plaintiff also requests a multiplier. Multipliers are appropriate where public interest litigation is involved and incentives are necessary for plaintiffs or the public to obtain counsel. California courts repeatedly have found that this is not the case in single-plaintiff FEHA cases, such as this one, in which statutory attorney[ ] fees are all but guaranteed. [(*Weeks v. Baker & McKenzie* (1998) 63 Cal.App.4th 1128 (*Weeks*).)] The Court finds that, while this case was taken on a contingency, the complexity of the case does not warrant a multiplier." The court thus ordered a total fee award of $342,284.

Guerrero contends the trial court applied the wrong legal standard and thus abused its discretion in declining to apply a multiplier to the lodestar figure based on the factor of contingent risk. We agree.

61

B.    *Analysis*

Pursuant to FEHA, the trial court, "in its discretion, may award to the prevailing party . . . reasonable attorney[ ] fees and costs[.]" (§ 12965, subd. (b).)  As the fees to be awarded are a matter of discretion, it follows that a ruling on a motion for attorney fees under FEHA is reviewed for an abuse of discretion.  (*Horsford, supra,* 132 Cal.App.4th at p. 394.)

" 'There are two ways to show an abuse of discretion by the trial court. One way is to show the ruling was whimsical, arbitrary, or capricious, i.e., that the trial court exceeded the bounds of reason.  [Citation.]  The other way is to show the trial court erred in acting on a mistaken view about the scope of its discretion.' " (*Platypus Wear, Inc. v. Goldberg* (2008) 166 Cal.App.4th 772, 782.)  " 'Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such an action an "abuse" of discretion.' " (*Horsford*, *supra*, 132 Cal.App.4th at p. 393.)  It is in this sense—application of an incorrect legal standard—that the trial court abused its discretion in this case.

"[T]he lodestar is the basic fee for comparable legal services in the community[.]" (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132 (*Ketchum*).) The California Supreme Court has held that the lodestar "may be adjusted by the court based on factors including . . . (1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, [and] (4) the contingent nature of the fee award." (*Ibid.*, citing *Serrano v. Priest* (1977) 20 Cal.3d 25, 49 (*Serrano III*).)  "[T]he purpose of a multiplier 'is to fix a fee at the fair market value for the particular action.  In effect, the court determines, retrospectively, whether the litigation involved *a contingent risk or required extraordinary legal skill* justifying augmentation

62

of the unadorned lodestar in order to approximate the fair market rate for such services[.]' " (*Greene v. Dillingham Constr. N.A.* (2002) 101 Cal.App.4th 418, 427 (*Greene*) [FEHA case], quoting *Ketchum*, at p. 1132.)

In *Ketchum*, a SLAPP (strategic lawsuit against public participation) action, the high court addressed the "economic rationale for fee enhancement in contingency cases." (*Ketchum, supra*, 24 Cal.4th at p. 1132.) It explained that " '[t]he contingent fee compensates the lawyer not only for the legal services he renders but for *the loan of those services*. The implicit interest rate on such a loan is higher because the risk of default (the loss of the case, which cancels the debt of the client to the lawyer) is much higher than that of conventional loans.' " (*Id.* at pp. 1132–1133, italics added.) " 'A lawyer who both bears the risk of not being paid and provides legal services is not receiving the fair market value of his work if he is paid only for the second of these functions.' " (*Id.* at p. 1133.)

In *Weeks*, the single-plaintiff FEHA case cited by the trial court, the Court of Appeal reversed an award of fees on the ground that the factors cited by the trial court did not support its decision to apply a multiplier. (*Weeks, supra*, 63 Cal.App.4th at pp. 1174–1176.) In discussing the factor of contingent risk, the court stated that "because of the availability of attorney fees under the FEHA, [Weeks's] attorneys had reason to assume that the amount of Weeks's recovery would not limit the amount of fees they ultimately received. Thus, the risk that Weeks's attorneys would not be compensated for their work was no greater than the risk of loss inherent in any contingency fee case; however, because of the availability of statutory fees the possibility of receiving full compensation for litigating the case was greater than that inherent in most contingency fee actions." (*Id.* at p. 1174.) In the view of the *Weeks* court, the only risk associated with "[t]he contingent

63

nature of the litigation . . . was the risk that Weeks would not prevail," which it said was a risk "inherent in any contingency fee case[.]" (*Id.* at p. 1175.)

*Weeks* thus seemed to call into question whether contingent risk could be considered in deciding whether to apply a multiplier in FEHA cases. However, only three months before *Weeks*, the same court had decided *Flannery v. California Highway Patrol* (1998) 61 Cal.App.4th 629 (*Flannery*). (See *Greene, supra,* 101 Cal.App.4th at p. 428 [noting the sequence of *Flannery* and *Weeks*].) "In *Flannery*, another FEHA case, the court reaffirmed that contingent risk is a factor to be considered, as required by *Serrano III*," in deciding whether to apply a multiplier, although it "nonetheless reversed the trial court's application of a multiplier on the basis that the trial court had not applied the correct standards in determining the amount of the award." (*Greene*, at p. 428.)

*Ketchum* was decided after *Weeks*. In *Ketchum*, our Supreme Court reaffirmed that the *Serrano III* factors, including contingent risk, are the relevant factors to be considered in adjusting a lodestar to arrive at an overall fee award under Code of Civil Procedure section 425.16. (*Ketchum, supra,* 24 Cal.4th at pp. 1130–1139.) Subsequent cases deciding whether to award multipliers in FEHA cases have followed *Ketchum* and have held that contingent risk remains a factor to be considered in determining whether to apply a multiplier. (*Greene, supra,* 101 Cal.App.4th at pp. 428–429 [FEHA case; stating that "in *Ketchum* . . . the Supreme Court has reaffirmed that contingent risk is a valid consideration in determining whether to apply a fee enhancement in cases where attorney fees are authorized by statute"]; *Horsford, supra,* 132 Cal.App.4th at pp. 394–395 [FEHA case; noting that under *Ketchum*, "the contingent and deferred nature" of a fee award "requires that the fee be adjusted in some manner to reflect the fact that the fair

64

market value of legal services provided . . . is greater than the equivalent noncontingent hourly rate"]; *Nichols v. City of Taft* (2007) 155 Cal.App.4th 1233, 1241 (*Nichols*) [FEHA case; stating "[w]e take it . . . as established principle that a trial court's decision whether to apply a multiplier is a discretionary one, as the Supreme Court's decision in *Ketchum* made clear"]; *Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1251–1252 (*Taylor*) [FEHA case; affirming trial court's selection of a 1.5 multiplier under the factors identified in *Ketchum*].)

In *Greene*, in fact, the appellate court was called to review a trial court ruling very similar to the ruling in this case. *Greene* was a single-plaintiff racial harassment case brought under FEHA. After prevailing at trial, Greene moved for an award of attorney fees under section 12965, subdivision (b). The hearing on the motion took place before *Ketchum* was decided. During the hearing, there was an extended colloquy about whether *Weeks* and *Flannery* "had, in practical effect, eliminated contingent risk as one of the factors to consider in imposing a multiplier." (*Greene*, *supra*, 101 Cal.App.4th at p. 427.) Although the "record [was] not as clear as it might be," it appeared from the trial court's subsequent ruling that it had concluded that "this was the holding of *Weeks*." (*Id.* at pp. 427, 428.) Because in *Ketchum* the Supreme Court had reaffirmed that contingent risk is a valid consideration in determining whether to apply a multiplier, the appellate court decided the trial court's conclusion was erroneous and remanded the matter so the court could exercise its discretion on whether a fee enhancement was merited based on contingent risk. (*Id.* at pp. 428–429.)

This case is very much like *Greene*, except that there is now even more authority confirming that contingent risk should be considered in determining whether to apply a multiplier. Here, citing *Weeks*, the trial court

asserted in its minute order that while "[m]ultipliers are appropriate where public interest litigation is involved and incentives are necessary for plaintiffs or the public to obtain counsel," that "California courts repeatedly have found that this is not the case in single-plaintiff FEHA cases, such as this one, in which statutory attorney[ ] fees are all but guaranteed. [Citation to *Weeks*]." The trial court then found that "while this case was taken on a contingency, the complexity of the case does not warrant a multiplier."

The trial court's ruling was not verbose, but one thing is certain: under *Ketchum*, *Greene*, *Horsford*, *Nichols*, and *Taylor*, the court's assertion that multipliers are inappropriate "in single-plaintiff FEHA cases" was a misstatement of the relevant law. Guerrero contends the court specifically failed to give appropriate weight to the factor of contingent risk and the delay in payment associated with taking a case on contingency. While the court's ruling provides little insight into its reasoning, its citation to *Weeks* supports the view that it regarded contingent risk as, at most, a disfavored factor to the extent it considered it at all. The court's statement "while this case was taken on a contingency" does not convey that it gave meaningful consideration to contingent risk in determining whether a multiplier was appropriate.

On this record, we conclude the trial court's mistaken belief that multipliers are not appropriate in single-plaintiff FEHA cases affected its evaluation of the factors of contingent risk and associated delay in payment that Guerrero relied on in support of a multiplier. By applying the wrong legal standard, the trial court abused its discretion. (See *Nichols*, *supra*, 155 Cal.App.4th at p. 1242.)

Accordingly, we will reverse the trial court's attorney fee order insofar as it denied a multiplier and remand so the trial court can exercise its

66

discretion and consider whether the factors of contingent risk and delay support applying a multiplier enhancement to the lodestar under the standard set forth in *Ketchum*. We express no opinion on the outcome of the court's decision.

## DISPOSITION

The judgment on the merits is affirmed. The order granting in part and denying in part Guerrero's motion for an award of attorney fees is reversed insofar as it denies Guerrero's request for a multiplier, and the matter is remanded to the trial court with directions to consider whether to apply a multiplier for the contingent risk factor. Guerrero shall recover her costs on appeal.

DO, J.

WE CONCUR:


McCONNELL, P. J.


DATO, J.